# CASES

# COURT OF NISI PRIUS,

# PHILADELPHIA.

---

## Olmsted's Case.

### [APRIL 17, 1809.]

A state court has a right to discharge a prisoner committed under process from a federal court, if it clearly appears that the federal court had no jurisdiction of the case.

Questions of prize, since the adoption of the constitution of the United States, are exclusively within the jurisdiction of the federal courts.

It is not sufficient, to oust the jurisdiction of the federal courts, that the state claims an interest in the subject of the dispute.

The best rule by which to arrive at the meaning and intention of a law, is to abide by the *words* which the law-maker has used; and this rule holds most strongly in expounding a constitution.

It is not a justification of the offence of obstructing the execution of process issued out of a federal court, that the defendants were subordinate officers of the militia of a state, and acted under the sanction of a law of the state, and under orders from the governor and commander in chief of the militia of the state.

*It seems*, that the 11th article of the amendments to the constitution of the United States, which declares that "the judicial power of the United States shall not be construed to extend to any suit *in law or equity*, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state," does not extend to suits of admiralty or maritime jurisdiction.

B

[ Olmsted's Case. ]

On the 25th of November, 1775, congress passed an act for the purpose of erecting tribunals of admiralty jurisdiction. The 4th section provides, " that it be and is hereby recommended to the several legislatures in the united colonies, as soon as possible, to erect courts of justice, or give jurisdiction to the courts now in being, for the purpose of determining concerning the captures to be made as aforesaid, *and to provide that all trials in such case be had by a jury, under such qualifications as to the respective legislatures shall seem expedient;*" and the 6th section provides that, " in *all cases* an appeal shall be allowed to the congress, or such person or persons as they shall appoint for the trial of appeals."

By resolutions of congress, in 1777, a committee of appeals was appointed, consisting of members of congress, any three of whom were empowered to hear and finally determine upon appeals brought to congress.

On the 9th of September, 1778, the state of Pennsylvania passed an act for establishing a court of admiralty, the 6th and 7th sections of which provided, that the trial in such cases should be by jury; that " the finding of the jury shall establish the *facts*, without re-examination or appeal;" and " that in all cases of captures, an appeal from the decree of the judge of admiralty of this state, shall be allowed to the continental congress, or such person or persons as they may, from time to time, appoint for hearing and trying appeals."

The British sloop Active was captured on the high seas in September, 1778, by Gideon Olmsted and others, and brought into the port of Philadelphia, where she was libelled in the court of admiralty, held before George Ross, Esquire, then judge of that court. Olmsted and the others claimed the whole vessel and cargo exclusively; but Thomas Huston, commander of the brig Convention, *a vessel of war belonging to the state of Pennsylvania*, claimed a moiety *for the state*, himself and crew; and James Josiah,

master of the sloop Gerard, a private vessel of war, claimed for himself, owners and crew, a fourth part; leaving a fourth for Olmsted and his associates. The ground of the two latter claims was, that the Gerard and Convention were in sight at the time of the capture, and before hostilities between Olmsted and the crew of the Active had ceased.

On the 4th of November, 1778, the libels were tried before a jury, and a general verdict was rendered, by which each of these claims were recognised and allowed. From the judgment of the court, on this verdict, Olmsted appealed to the " continental congress, or such court and authority as they shall constitute and appoint to hear and determine the said appeal." And on the 15th of December, 1778, the committee of appeals, (then consisting of the Hon. Oliver Ellsworth, late chief justice of the United States, the Hon. William Henry Drayton, formerly chief justice of South Carolina, William Ellery and John Henry, Jr., Esquires,) reversed the decree of Judge Ross, and decreed the whole of the proceeds to the appellants. Judge Ross refused to obey this decree of reversal, because the case had been tried before him by a jury; and paid a moiety of the net proceeds of the prize into the treasury of Pennsylvania, taking a bond of indemnity from David Rittenhouse, the treasurer, in pursuance of a resolution of the supreme executive council, dated April 21, 1779.

The committee of appeals thereupon ordered it to be entered on record, that the judge and marshal of the admiralty had absolutely refused obedience to their decree, that they were unwilling, at that critical juncture in the public affairs, to enter upon any proceedings for contempt, but that they would not hear any appeal until their authority should be so settled as to give full efficacy to their decrees and process. They laid a statement of the whole proceedings before congress, which was referred to a committee, who, in a brief report, demonstrated the powers of congress, and the jurisdiction of the committee of appeals;

[ Olmsted's Case. ]

and, by resolution, requested the state legislature to appoint a committee to confer upon the subject with the committee of congress. This was not acceded to, but on the 29th of November, 1779, the legislature passed an act directing George Ross, Esquire, to pay over the whole proceeds to David Rittenhouse, Captain Huston and Captain Josiah.

Olmsted thereupon brought suit in the court of common pleas, for the county of Lancaster, against the executors of Judge Ross, then deceased, where he obtained judgment by default; whereupon the executors delivered to him the bond of indemnity which Judge Ross had taken from David Rittenhouse, the state treasurer. Upon this bond, Olmsted instituted a suit in the supreme court of Pennsylvania, in the name of the executors of Ross, for his use, against Mr. Rittenhouse, in which it was decided, at April sessions, 1792, that neither the court of common pleas nor the supreme court had jurisdiction of the cause, and judgment was accordingly entered for the defendant. 2 *Dall.* 160.

In 1802, Olmsted and his associates, in consequence of the decision of the supreme court of the United States, in *Penhallow* v. *Doane's Administrators*, 3 *Dall.* 54, that the district courts of the United States had authority to carry into execution the decrees of the committee of appeals, appointed by congress under the old confederation, filed their libel in the district court of Pennsylvania, in which they prayed that Mrs. Sergeant and Mrs. Waters, the daughters and executrices of Mr. Rittenhouse, might be cited to appear and produce an account of the moneys received by their father from the sale of the Active, and to abide the order of the court. The decree of Judge PETERS, on the 14th of January, 1803, was in favour of the libellants; but no application was made to that court for peremptory process against the respondents for several years. In the interval, Mr. Olmsted, who had centred in himself the claims of all the libellants, ineffectually applied to the legislature of Pennsylvania for relief.

[ Olmsted's Case. ]

On the 2d of April, 1803, an act was passed authorizing the governor to direct the attorney-general to demand the money from the executrices, or to bring suit against them in case of refusal. The governor was also authorized " to protect the just rights of the state, in respect of the premises, by any further means or measures that he may deem necessary for the purpose, and also to protect the persons and properties of the said Elizabeth Sergeant and Esther Waters from any process whatever issued out of any federal court, in consequence of their obedience to the requisition," made by the attorney-general, and also " in the name of this commonwealth," to give them " a sufficient instrument of indemnification."

On the 29th of May, 1807, Mrs. Sergeant and Mrs. Waters filed a suggestion in the district court, reciting this act at length. They further stated, that being required by the proper authority to pay into the treasury the money admitted to have been received as executrices of David Rittenhouse, in manner aforesaid, they had paid the same into the treasury. That the money came into the hands of Mr. Rittenhouse as the treasurer, as appears by his bond, and that the decree of the court was pronounced, so far as respected the rights and jurisdiction of the state, *ex parte*, and without jurisdiction.

Compulsory process against the executrices was then demanded on behalf of Olmsted, but Judge Peters being fearful of embroiling the government of the United States and that of Pennsylvania, and being desirous of having his own opinion corroborated by that of the supreme court of the United States, refused to grant it; and alleged these reasons, *inter alia*, in his return to a *mandamus* issued from that tribunal. At the February sessions, 1809, this return was argued, and a peremptory *mandamus* awarded. 5 *Cranch*, 115.

On the 27th of February, 1809, the governor of Pennsylvania issued his orders to General Michael Bright, di-

recting him to call out a portion of the militia, in order to protect the persons and property of the executrices against any process which might be issued in consequence of the *mandamus.*

. On the 24th of March, 1809, the marshal of the United States received an attachment against the persons of the executrices, and on the 25th was prevented from serving the process by the soldiers under the command of General Bright. On the 15th of April, the marshal eluded the vigilance of the militia, and succeeded in executing his process upon Mrs. Sergeant. On the 17th, a writ of *habeas corpus* was issued, upon the petition of Mrs. Sergeant, directed to John Smith, the marshal, and returnable before the Chief Justice of Pennsylvania. To this writ the marshal returned, that he held Mrs. Sergeant in custody by virtue of the attachment issued from the district court of the United States.

After argument, the following opinion was delivered by

TILGHMAN, C. J.—If I order Mrs. Sergeant to be discharged, it must be because the court of the United States has proceeded in a case in which it had no jurisdiction. If it had jurisdiction, I have no right to inquire into its judgment or interfere with its process. But the counsel of Olmsted have brought forward a preliminary question, whether I have a right to discharge the prisoner even if I should be clearly of opinion that the district court had no jurisdiction. I am aware of the magnitude of this question, and have given it the consideration it deserves. My opinion is, with great deference to those who may entertain different sentiments, that in the case supposed I should have a right and it would be my duty to discharge the prisoner. This right flows from the nature of our federal constitution, which leaves to the several states absolute supremacy in all cases in which it is not yielded to the United States. This sufficiently appears from the general scope and spirit of the instrument.

[ Olmsted's Case. ]

The United States have no power, legislative or judicial, except what is derived from the constitution. When these powers are clearly exceeded, the independence of the states, and the peace of the union demand that the state courts should, in cases brought properly before them, give redress. There is no law which forbids it; their oath of office exacts it, and, if they do not, what course is to be taken? We must be reduced to the miserable extremity of opposing force to force, and arraying citizen against citizen; for it is in vain to expect that the states will submit to manifest and flagrant usurpations of power by the United States, if (which God forbid) they should ever attempt them. If congress should pass a bill of attainder, or lay a tax or duty on articles exported from any state, (from both which powers they are expressly excluded,) such laws would be null and void, and all persons who acted under them would be subject to actions in the state courts. If a court of the United States should enter judgment against a state which refused to appear in an action brought against it by a citizen of another state, or of a foreign state, such judgment would be void, and all persons who act under it would be trespassers. These cases appear so plain that they will hardly be disputed: it is only in considering doubtful cases that our minds feel a difficulty in deciding; but, if in the plainest case which can be conceived, the state courts may declare a judgment to be void, the principle is established. But while I assert the power of state courts, I am deeply sensible of the necessity of exercising it with the greatest discretion. Wo to that judge who rashly or wantonly attempts to arrest the authority of the United States; let him reflect again and again before he declares that a law or a judgment has no validity. The counsel for Mrs. Sergeant have with great candour and propriety admitted, that when there is reasonable cause for doubt, that doubt should be decisive in favour of the judgment in question. The same principle has been adopted by the judges of the supreme court of the

[Olmsted's Case.]

United States, and of our own state, when questions concerning the validity of laws have come before them, and it has my hearty approbation.

Having disposed of the preliminary question, I will now consider the point of jurisdiction. If the district court had no jurisdiction, it must either be on account of the subject of the suit, or the persons who were parties. I will examine them separately. The subject is a matter of prize, which arose before the adoption of the present constitution. By the 2d section of the 3d article of the constitution, the judicial power of the United States extends "to all cases of admiralty and maritime jurisdiction." These expressions comprehend all cases which had arisen or which should arise; and it was no doubt the intent to comprehend them; because otherwise, all antecedent cases would have been left unprovided for. I believe this construction has universally prevailed, nor has it been questioned in the course of the argument in this case. It appears then, that the subject of the libel is directly within the jurisdiction of the court, being a matter of admiralty jurisdiction. It is unnecessary for me to give any opinion concerning the right of the old court of appeals to reverse the decision of juries, contrary to the provisions of the act of assembly of Pennsylvania, under which the state court of admiralty was instituted. That is the point which occasioned so much jealousy and heartburning between several of the states and the old congress; it divided the opinions of many men of unquestionable talents and integrity, and certainly was a question of no small difficulty. But the state of Pennsylvania, having ratified the present constitution, did thereby virtually invest the courts of the United States with power to decide this controversy. They have decided it, and being clearly within their jurisdiction, I am not at liberty to consider it as now open to discussion. The supreme court of the United States has more than once decided, that the old court of appeals had the power to reverse the verdict of juries, notwith-

[Olmsted's Case.]

standing the law of any state to the contrary. From the establishment of this principle, it irresistibly results, that Gideon Olmsted and his associates were entitled to the whole proceeds of the Active and her cargo, and may pursue them into whatever hands they have fallen, unless indeed they have fallen into the hands of persons not subject to an action in the courts of the United States. This leads me to the question concerning the parties to the suit, the only question which has appeared to me to be of real difficulty, and which I was pleased to hear argued with great force and candour by the counsel for Mrs. Sergeant. It is declared by the 11th article of the amendments of the constitution, that "the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against any one of the United States, by citizens of another state, or by citizens or subjects of any foreign state." The record in this case shows a suit between citizens of Connecticut and citizens of Pennsylvania. It is therefore not within the words of the amendment. But it is contended, that although not within the words, it is within the spirit, because the suit is brought against persons representing an officer of the state, who received the property in question for the use of the state. There is weight in the observation, that the inconvenience would be very great, if the plaintiff in any action might by an evasion, by substituting the officer of the state in the place of the state, compel the state to abandon its property or contest it in the courts of the United States. In a case so circumstanced, the argument would be very powerful against the jurisdiction of the federal courts. But I cannot say, judging from the facts judicially disclosed to me, (which are all that I can judge from,) that the present case is so circumstanced. The certificates were certainly paid to Mr. Rittenhouse, as treasurer of the state. But it is equally certain, that neither he nor his representatives since his death, did deposit them in the treasury of Pennsylvania; on the

[ Olmsted's Case. ]

contrary, they were invested by him in a new fund in his own name, and it appears by his written memorandum, that he did not consider them as the property of the state, but his own property, until the state should give him a certain indemnification, which was never given. If this evidence is not strong enough to show that the certificates and money were not in the possession of the state, it acquires an additional strength, difficult to resist, from the circumstance stated in the answer of Elizabeth Sergeant and Esther Waters, "that they had refused to deliver them to the treasurer of the state, although expressly required so to do." Whether the conduct of Mr. Rittenhouse and his executrices was right or wrong is not the point now to be inquired into. The fact is that they did withhold the certificates and interest money from the treasury, until after the final decree of the district court. Their paying it afterwards cannot affect the question of jurisdiction. How then does the case stand? The property of these certificates and interest money was irrevocably vested in Olmsted, &c., by the decree of the former court of appeals, which the supreme court of the United States, since the adoption of the present constitution, has decided to be conclusive. The possession was not in the state, and the suit was not brought against the state or any of its officers. I do not see then how it can be maintained, even under a liberal construction of the 11th article of the amendments, that the state was a party to the suit in the district court. Several acts and resolutions of the legislature of Pennsylvania were read in the course of the argument, concerning which I am not called upon to decide. I exercise the right, in common with my fellow-citizens, of speaking my sentiments on political occurrences in private conversations, but it would ill become me on this occasion to express any opinion concerning the policy which the state has thought proper to pursue. Whatever they have done, I extend to them the same charity which I ask for myself, the belief that they have acted from

[ Olmsted's Case. ]

pure motives.   But although I say nothing concerning the policy of the government, I may be allowed, without impropriety, to express my anxious hope, that this long continued controversy will be brought to a termination without any material interruption of that harmony between this state and the United States so essential to the prosperity of both.

On the whole of this case, I cannot say that it clearly appears to me, that the district court of the United States made its decree in a cause of which it had no jurisdiction. I must order therefore that Mrs. Sergeant remain in the custody of the marshal.*

* At the April term, 1809, Gen. Bright and several others were indicted in the circuit court of the United States, under the twenty-second section of the act of congress of the 30th April, 1790, for obstructing the process of the court.   On the trial of this case the following charge to the jury was delivered by

WASHINGTON, J.—Impressed with the magnitude of the questions which have been discussed, we could have wished for more time to deliberate upon them, and for an opportunity to commit to writing the opinion which we have formed, that it might have been rendered more intelligible to you, and less susceptible of being misunderstood by others.   But we could not postpone the charge, without being guilty of the impropriety of suffering the jury to separate, after the arguments of counsel were closed, or of keeping them together until Monday; a hardship which we could not think of imposing upon them.   I shall proceed therefore to state to you, in the best way I can, the opinion of the court upon this novel and interesting case.   It may not be improper, in the first place, to refresh your minds with a short history of the transactions which have led to the offence with which these defendants are charged; and to consequences which might have been of serious import to the nation.

Gideon Olmsted and three others, having fallen into the hands of the enemy, during the latter part of the year 1778, were put on board the sloop Active at Jamaica, as prisoners of war, in order to be conducted to New York, whither this vessel was destined with supplies for the British troops.   During the voyage, Olmsted and his companions, who had assisted in navigating the vessel, formed the bold design of taking her from the enemy; in which, with great hazard to themselves, they ultimately succeeded.   Having confined in the cabin the officers, passengers, and most of the men, they steered for some port in the United States, and had got within five miles of Egg Harbour, when Captain Huston, commanding the brig Convention, belonging to the state of Pennsylvania, came up with them, and captured the Active as a prize.   The sloop was conducted to Philadelphia, and libelled in the court of admiralty, established under an act of the legislature of that state.

[ Olmsted's Case. ]

Claims were filed by Olmsted and his associates for the whole of the vessel and cargo, and by James Josiah, commander of a private armed vessel, which was in sight at the time of the capture by Huston, for a proportion of the prize. Depositions were taken in the cause. A jury was impannelled to try it. The question of fact was, whether the enemy was completely subdued or not, by Olmsted and his companions, at the time when Capt. Huston came up with them.—The jury, without stating a single fact, found a general verdict, for one fourth to Olmsted and his associates, and the residue to Huston and Josiah, to be divided according to law and an agreement between them. From the sentence of the court upon this verdict, Olmsted appealed to the court of appeals in prize causes, established by congress, where, after a hearing of the parties, the sentence of the admiralty court was reversed, the whole prize decreed to the appellants, and process was directed to issue from the court of admiralty, commanding the marshal to sell the vessel and cargo, and to pay over the net proceeds to those claimants.

The judge of the court of admiralty refused to acknowledge the jurisdiction of the court of appeals over a verdict found in the inferior court; directed the marshal to make the sale, and to bring the proceeds into court. This was done, and the judge acknowledged the receipt of the money, on the marshal's return. In May, 1779, George Ross, the judge of the court of admiralty, delivered over to David Rittenhouse, treasurer of this state, £11,469 9s. 9d. in loan office certificates, issued in his own name, being the proportion of the prize money to which the state was entitled, by the sentence of the inferior court of admiralty. Rittenhouse at the same time executed a bond to Ross, obliging himself, his heirs, executors, &c., to restore the sum so paid, in case Ross should, by due course of law, be compelled to pay the same according to the decree of the court of appeals. In the condition of this bond, the obligor is described as being treasurer of the state; and the money is stated as having been paid to him for the use of the state.—Indents were issued to Rittenhouse, on the above certificates, and these were afterwards funded in the name of Rittenhouse, for the benefit of those who might eventually appear to be entitled to them.

After the death of Rittenhouse, these certificates, together with the interest thereon, which had been received, came to the hands of Mrs. Sergeant and Mrs. Waters, his representatives. The papers which covered the certificates were endorsed in the hand-writing of Mr. Rittenhouse, with a memorandum declaring that they will be the property of the state of Pennsylvania, when the state releases him from the bond he had given to George Ross, judge of the admiralty, for paying the fifty original certificates into the treasury as the state's share of the prize. No such release ever was given. The certificates thus remaining in the possession of the representatives of Rittenhouse, Olmsted filed his libel against them in the district court of Pennsylvania, praying execution of the decree of the court of appeals. Answers were filed by these ladies; but no claim was interposed, nor any suggestion made of interest on the part of the state, and in January, 1803, the court decreed in favour of the libellants.

On the 2d of April, in the same year, the legislature of Pennsylvania passed a law, authorizing the attorney-general to require Mrs. Sergeant and Mrs.

[ Olmsted's Case. ]

Waters to pay into the treasury the moneys acknowledged by them, in their answer in the district court, to have been received, without regard to the decree of that court; and in case they should refuse, that a suit should be instituted against them in the name of the commonwealth for the said moneys. The governor was also required to protect the just rights of the state, by any further measures he might deem necessary; and also to protect the persons and properties of those ladies from any process which might issue out of the federal court, in consequence of their obedience to this requisition, and further should give them a sufficient instrument of indemnification in case they should pay the money to the state. No further proceedings took place in the district court for some time after the passage of this law.

And when, at length, an application was made for process of execution, the judge of that court, with a very commendable degree of prudence, declined ordering it; with a view to bring before the supreme court of the United States a question so delicate in itself, and which was likely to produce the most serious consequences to the nation. Upon the application of Olmsted, the supreme court issued a mandamus to the judge of the district court, commanding him to execute the sentence pronounced by him in that case, or to show cause to the contrary. The reasons for withholding the process, assigned in answer to this writ, not being deemed sufficient by the supreme court, a peremptory mandamus was awarded.

It may not be improper here to state, that no person appeared in the supreme court on the part of the state, or on that of Mrs. Sergeant and Mrs. Waters, and that no arguments were offered on the part of Olmsted. The idea, which I understand has gone abroad, that the mandamus was awarded upon the single opinion of the chief justice, is too absurd to deserve a serious refutation. No instance of that sort ever did or could occur; and in this particular case, I do not recollect that there was one dissentient from the opinion pronounced.

Process of execution having been awarded by the judge of the district court, in obedience to the mandamus, the defendant, General Michael Bright, commanding a brigade of the militia of the commonwealth of Pennsylvania, received orders from the governor of the state,—"immediately to have in readiness such a portion of the militia under his command, as might be necessary to execute the orders, and to employ them to protect and defend the persons and the property of the said Elizabeth Sergeant and Esther Waters, from and against any process, founded on the decree of the said Richard Peters, judge of the district court of the United States aforesaid; and in virtue of which, any officer, under the direction of any court of the United States, may attempt to attach the persons or the property of the said Elizabeth Sergeant and Esther Waters." A guard was accordingly placed at the houses of Mrs. Sergeant and Mrs. Waters, and it has been fully proved, and is admitted, that the defendants, with a full knowledge of the character of the marshal of this district, of his business, and his commission, and the process which he had to execute having been read to them, opposed, with muskets and bayonets, the persevering efforts of that officer to serve the writ; and by such resistance, prevented him from serving it.

There is no dispute about the facts. The defendants have called no witnesses; and their defence is rested upon the lawfulness of the acts laid in the indictment. They justify their conduct upon two grounds—1st. That the

[ Olmsted's Case. ]

decree of the district court, under which the process was issued, was *coram non judice*, and to all intents and purposes void; and 2dly. That though it were a valid and binding decree, still that they cannot be questioned criminally for acting in obedience to the orders of the governor of the state.

The decree of the district court is said to be void, for two reasons; first, because the court of appeals had not power to reverse the sentence of the court of admiralty, founded upon the verdict of a jury; and, secondly, because the state of Pennsylvania claims an interest in the subject which was in controversy in the district court.

The first question is, was the decree of the court of appeals void for want of jurisdiction of the case in which it was made? But first let me ask; can this be made a question at the present day, before this or any other court in the United States? We consider it to be so firmly settled by the highest judicial authority in the nation, that it is not now to be questioned or shaken. The power of the court of appeals, to re-examine and reverse or affirm the sentence of the courts of admiralty established by the different states, though founded upon the verdicts of juries, was first considered and decided in the case of *Penhallow* v. *Doane*, in the supreme court of the United States. The jurisdiction of that court to re-examine the whole cause, as to both law and fact, was considered as resulting from the national character of an appellate prize court, and not from any grant of power by the state, from whose court the appeal had been taken. The right of the state to limit the court of appeals in the exercise of its jurisdiction, was determined to be totally inadmissible. The same question was considered by the supreme court upon the motion for the mandamus, and decided to be settled and at rest. If it were necessary to give further support to the authority of these cases, the opinion of the supreme court of Pennsylvania in *Ross's Executors* v. *Rittenhouse*, and the unanimous opinion of the old congress, with the exception of the representatives of this state, and one of the representatives of New Jersey, might be mentioned. If reasons were required to strengthen the above decisions, those assigned by the committee of congress, upon the case of the Active, are believed to be conclusive.

But I think it will not be difficult to prove that the law of Pennsylvania, passed on the ninth of September, 1778, establishing a court of admiralty in that state, neither by the terms of it, nor by a fair construction of its meaning, was intended to abridge the jurisdiction of the court of appeals in cases like the one under consideration. The words are, "that the jury shall be sworn or affirmed to return a true verdict upon the libel according to evidence; and the finding of the jury shall establish the facts without re-examination or appeal." The obvious meaning of this provision was, that if the jury found the facts upon which the law was to arise, those facts were to be considered as conclusive by the appellate court, and not open to re-examination by the judges of that court; the legislature thinking it, no doubt, most safe to intrust the finding of facts to a jury of twelve men. But what was to be done if the jury found no facts, as was the present case? If the appellate court were precluded from an inquiry into the facts, affirmance of the sentence appealed from would be inevitable. This absurdity then followed—in *all cases* it was necessary to impannel a jury to establish the facts, and in *all cases*, without

[ Olmsted's Case. ]

exception, the party thinking himself aggrieved might appeal. But in every case where the jury choose to find a general verdict, the sentence appealed from must of necessity be affirmed. I cannot believe that this was the meaning of the legislature; and I do not think that the words of the law will fairly warrant such a construction. Let me then put the question seriously to the jury: will they have the vanity to think themselves wiser than all those who have passed opinions upon this important *question of law?* And will they undertake to decide that those opinions were erroneous? Miserable, indeed, must be the condition of that community where the law is unsettled, and decisions upon the very point are disregarded, when they again come, directly or incidentally, into discussion. In such a state of things good men have nothing to hope, and bad men nothing to fear. There is no standard by which the rights of property, and the most estimable privileges to which the citizens are entitled, can be regulated. All is doubt and uncertainty, until the judge has pronounced the law on the particular case before him; but which carries with it no authority, as to a similar case between other parties.

But suppose, for a moment, against the settled law upon the point, that the court of appeals had not a power to re-examine the verdict of the jury, in the case of the Active; and on that account that the decree of the district court in opposition to that of the court of admiralty was erroneous, it does not therefore follow, that the district court had no jurisdiction of the case, on which this process issued. If erroneous, it could only be re-examined and corrected in a superior court. But if the subject depended upon a question of prize, or no prize, it was completely within the cognizance of the district court, by the constitution and laws of the United States; the former of which grants to the federal courts, and the latter to the district courts, *cognizance of all civil causes of admiralty and maritime jurisdiction. This is such a cause;* and we consider that circumstance to be decisive of the first point. We are happy upon this occasion, as we are upon all others, to coincide in opinion with the learned and respectable gentleman who presides in the supreme judiciary of this state.

The next ground of objection to the jurisdiction of the district court is, that the state of Pennsylvania claimed an interest in the subject of dispute between the parties in that cause.

The amendment to the constitution, upon which this question occurs, declares that " the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States, by citizens of another state, or by citizens or subjects of any foreign state." It is certain, that the suit in the district court was not commenced or prosecuted against the state of Pennsylvania. She was in no respect a party to that suit. But, it is contended, that under a fair construction of this amendment, if a state claims an interest in the subject in dispute, the case is not cognizable in a federal court. In most cases it will be found that the soundest and safest rule by which to arrive at the meaning and intention of a law, is to abide by the words which the lawmaker has used. If he has expressed himself so ambiguously that the plain interpretation of the words would lead to absurdity, and to a contradiction of the obvious intention of the

law, a more liberal course may be pursued. But if upon any occasion the strict rule should be observed, it ought to be in expounding the constitution; although I do not mean to say that even in that case this rule should be inflexible. Every reason is opposed to the construction contended for by the defendants' counsel; and, to our apprehension, there is not one sound reason in favour of it. If the title to the thing in dispute be in the state, and this is made to appear to the court, it is inconceivable that the plaintiff should recover so as to disturb that right. But if he should recover, the state would not be bound by the judgment, not being a party to it. This is by no means a new case. If one individual obtains a judgment or decree against another, the interest of a third person, not a party, will not be bound or prejudiced by the decision; but he may, nevertheless, assert his right in a court of justice against the party in possession of the property to which he claims title. The state cannot be forced into court, but she may come there, if she pleases, in pursuit of her rights, and will no doubt do so upon all proper and necessary occasions.

But if, on the other hand, the mere claim of interest by a state in the subject in dispute between two citizens can have the magic effect of suspending all the functions of a court of justice over that subject, and of annihilating its decrees when pronounced, this effective and necessary branch of our government, and of all free governments, may be rendered useless at any moment, at the pleasure of a state. If the suit be prosecuted against a state, the court perceives, at once, its want of jurisdiction, and can dismiss the party at the threshold. But if a latent claim in the state, not known, perhaps, by any of the litigant parties, is sufficient to oust the jurisdiction, to annul the judgment when rendered, and to affect all the parties concerned, with the consequences of carrying a void judgment into execution, the federal courts may become more than useless: they will be traps, in which unwary suitors may be insnared to their ruin. To illustrate this position, the district attorney mentioned many very strong and very supposable cases. I will add one other. A. sues B. for a debt, or for property either real or personal in his possession. Conscious that he must pay the money or lose his possession, in consequence of the unquestionable title of his adversary, B. pays over the money, or conveys the property, even pending the suit, to a third person for the use of the state, and by this operation arrests the further progress of the suit, or avoids the judgment, whenever it shall pass. A doctrine so unjust, and big with consequences so alarming, and so fatal to the general government, should have strong and unequivocal words to support it. The court would be very mischievously employed in supplying them. We should convert this amendment, this sacrifice made to state pride, into an engine to demolish altogether one of the essential branches of the general government.

To this branch of the argument, therefore, the answer is short, but conclusive. The state is not a party, and she has no interest in the subject in dispute in the district court. The decree of the court of appeals extinguished the interest of Pennsylvania in any share of the Active and her cargo, and vested the full right to the whole in Olmsted and his associates, who might rightfully follow that part of the proceeds which came into the hands of the representatives of Rittenhouse, who held them as stakeholders for whoever

[Olmsted's Case.]

might have title to them. Rittenhouse himself held them in his private capacity, and not as treasurer, for his individual security against the bond given to Ross, and which was still outstanding when this decree was rendered. I know not how this part of the subject can be made plainer.

There is another objection to the argument drawn from the interest of the state, which was not satisfactorily answered by Mr. Ingersoll, to whom it was stated by the court during the discussion. By the constitution of the United States the judicial power extends to all controversies between a state and citizens of another state, whatever might be the nature of the controversy, and no matter as to the court to which the cause might be assigned by the legislative distribution of the judicial powers. That amendment declares that the above provision shall not be construed to extend to any suit in law or equity commenced or prosecuted against a state by a citizen of another state, or an alien. This was not a suit at law, or in equity, but in a court of the law of nations, and in a case of admiralty and maritime jurisdiction. The question put to the learned counsel was, "is such a case excluded from the cognizance of the district court by this amendment?" The answer given was, that the amendment ought to be so construed, this case being equally within the mischief meant to be remedied: that is, the court is bound to supply the words "or to cases of admiralty and maritime jurisdiction." Would we be justified by any rule of law in admitting such an interpolation, even if a reason could not be assigned for the omission of those words in the amendment itself? I think not. In our various struggles to get at the spirit and intention of the framers of the constitution, I fear that this invaluable charter of our rights would, in a very little time, be entirely construed away, and become at length so disfigured, that its founders would recollect very few of its original features. But there appears to be a solid reason for the limitation of the amendment to cases at law and in equity. And this will throw some light upon the preceding branch of this argument. Suits at law and in equity cannot be prosecuted against a state without making her a party, and the judgment acts directly upon her. But in what manner was the execution to be made effectual? The subject was a delicate one, and it was thought best to avoid having it practically tested. But in cases of admiralty and maritime jurisdiction the property in dispute is generally in the possession of the court, or of persons bound to produce it, or its equivalent, and the proceedings are *in rem.* The court decides in whom the right is, and distributes the proceeds accordingly. In such a case the court need not depend upon the good will of a state claiming an interest in the thing to enable it to execute its decree. All the world are parties to such a suit, and of course are bound by the sentence. The state may interpose her claim and have it decided. But she cannot lie by, and after the decree is passed say she was a party, and, therefore, not bound for want of jurisdiction in the court. This doctrine, in relation to the proceedings of a court of the law of nations, and in which all nations are interested, might be productive of the most serious consequences to the general government, to whom are confided all our relations with foreign governments. As at present advised, then, we think that the amendment to the constitution does not extend to suits of admiralty and maritime jurisdiction.

The second ground of justification is founded upon the orders of the go-

C

vernor of this state, issued, as it is contended, under the sanction of a law of the state. Whether the true meaning of that law has been mistaken or not, it would perhaps ill become this court to decide; but it will not, I trust, be deemed indecorous if we express a hope that it was so. It is more agreeable to think that an individual should have been mistaken in his judgment (and in this case we are bound to think that the error, if any, was not of the heart) than that the legislature should have intended so open an attack upon the constitution and government of the United States. But if such was the design of the law, we must lament the circumstance, and must, without reserve, pronounce it to be unconstitutional and void. Upon what is the law predicated? Upon the invalidity of the sentence of the district court. But have the people of the United States confided to the legislatures of the states, or even to that of the United States, the power to declare the judgments of the national courts null and void? Could such a power be granted to them without sapping the foundations of the government and extinguishing the last spark of American liberty? It is a truth not to be questioned, that the power to declare the judgments of your courts void can never be safely lodged with a body who may enforce its decision by the physical force of the people. This power necessarily resides in the judicial tribunals, and can safely reside nowhere else. Whether a state court is competent to declare a judgment of a federal court void for want of jurisdiction need not now be considered. It may, however, be observed, that admitting the right in the first instance, the ultimate decision of the question belongs to the supreme judicial tribunal of the nation, if that decision be required; for the judicial power extends to all cases arising under the constitution, and the laws of the United States made in pursuance thereof; and the twenty-fifth section of the judicial law, with a view to secure to the national judiciary this important privilege, vests in the supreme court a power to review and affirm, or reverse, the decision of the highest court of law or equity in a state, where a question depending upon the construction of any clause in the constitution, treaty or statute of the United States had been decided against the title, &c., claimed under the constitution, &c. It seems, however, that this power is considered as being unsafely lodged in the national courts, because it may be abused for the purpose of drawing every case into the vortex of the federal jurisdiction. Whence can arise this jealousy? Had the judges of those courts, or of any courts, an interest in extending the sphere of their jurisdiction? Quite otherwise: as the jurisdiction of the court is abridged, the labour of the judge is diminished. Is it a privilege which is claimed for the advantage of the court or of the individuals who compose it? By no means. It is the privilege of the citizen, and as long as I have the honour of a seat on the bench, I will consider myself one of the guardians of this privilege, (a very feeble one I acknowledge,) and with a steady and unvarying eye, fixed upon the constitution as my guide, I shall march forward, without entertaining the guilty wish to limit this privilege, where the citizen may fairly claim it, or the desire, not less criminal, to enlarge its boundaries, because it is claimed.

If then the validity of the decree of the district court be established upon the ground of reason, upon the basis of the constitution—in part upon the opinion of congress and decisions of the supreme federal and state courts,

[ Olmsted's Case. ]

more than once given, what follows? That the governor of this state had no power to order the defendants to array themselves against the United States, acting through its judicial tribunals; and the legislature of the state was equally incompetent. to clothe him with such a power, had it so intended. The defendants were bound by a paramount duty to the government of the union, and ought not to have obeyed the mandate. There were but two modes by which the general government could assert the supremacy of its power on this occasion: by the peaceful interference of the civil authority; or by the sword. The first has been tried, and the defendants are now called to answer for their conduct before a jury of their country. Will any man be found bold enough to condemn this mode of proceeding, or complain that this alternative has been chosen? But if the accused can plead the orders of the governor as a justification of their conduct; and if the sufficiency of such a plea is established; the civil authority is done away, its means are inadequate to its end, and force must be resorted to. Are we prepared for such a state of things? The doctrine appears to us monstrous—the consequences of it terrible. We regret that it was broached. It was contended, that in a case where a state government authorizes resistance to the process of a federal court, though in a cause wherein the court had competent jurisdiction, the only remedy in such an emergency is negotiation. If there were no federal, no common head, this position might be admitted, and on the failure of the negotiations, the *ultima ratio* must be resorted to. But under our constitution of government, which declares the laws of the United States, made in pursuance of that instrument, the supreme law of the land, and which vests in the courts of the United States jurisdiction to try and decide particular cases, I am altogether at a loss to conceive how, in the case stated, negotiations between the general and paramount government, in relation to the powers granted to it, and a state government, can be necessary, and could ever be. proper. I speak not of the power, but of the right of resistance.

But it is contended that the defendants, standing in the character of sub-. ordinate officers to the governor and commander in chief of the state, were bound implicitly to obey his orders; and that although the orders were unlawful, still the officer and those under his command were justifiable in obeying them. The argument is imposing, but very unsound. In a state of open and public war, where military law prevails, and the peaceful voice of municipal law is drowned in the din of arms, great indulgences must necessarily be extended to the acts of subordinate officers done in obedience to the orders of their superiors. But even there, the order of a superior officer to take the life of a citizen, or to invade the sanctity of his house and to deprive him of his property, would not shield the inferior against a charge of murder, or trespass, in the regular judicial tribunals of the country.

In the case of *Little* v. *Barreme*, the supreme court of the United States felt every motive which could affect them as men to excuse an unlawful act performed by a meritorious officer. He was at sea, without the possibility of consulting with counsel, or others, as to the legality of the act he was about to execute, and which appeared to him to be authorized by the chief executive magistrate of the nation in the instructions received from the navy department. Notwithstanding all these powerful pleas in his favour; pleas

[Olmsted's Case.]

which were addressed strongly to the feelings of those who were to decide on his case, the supreme court conceived that the law of the land did not warrant the instructions given, and consequently that the officer was not justified in what he did. I am not sure, but I am induced to think that he afterwards obtained relief from congress.

This is said to be a hard case upon the defendants, because if they had refused obedience to the order of the governor, they would have been punished by the state. I acknowledge it is a hard case; but with this you have nothing to do if the law is against the defendants. It may, however, be observed, that had the defendants refused obedience, and been prosecuted before a military or state court, they ought to have been acquitted, upon the ground that the orders themselves were unlawful and void, and we ought of course to suppose that they would have been acquitted.

We enter not into the political discussions which have been so ably conducted on both sides; but we admonish you to discard from your minds all political considerations, all party feelings, and all federal or state prejudices. The questions involved in this case are in the highest degree momentous, and demand a cool and dispassionate consideration. We rely upon your integrity and wisdom for a decision which you can reconcile to your consciences, and to the duties which you owe to God and to your country.

The jury found the following special verdict:—And now, to wit, on this first day of May, in the year aforesaid, the jurors, sworn and affirmed, and impannelled, as aforesaid, upon their oaths and affirmations aforesaid, do find, that on the said 25th of March, 1809, in the city of Philadelphia aforesaid, that the defendants did, knowingly and wilfully, obstruct, resist, and oppose the said John Smith, then and there being an officer of the said United States, to wit, the marshal of the district of Pennsylvania, in attempting, then and there, to serve and execute the said judicial writ of arrest in the indictment mentioned, and that the said defendants then and there acted under the orders of the constituted authorities of the commonwealth of Pennsylvania, in so obstructing, resisting, and opposing the said marshal, as aforesaid, and whether, upon the whole matter, the law is in favour of the United States, or of the defendants, the jurors aforesaid refer to the consideration of the court: and if the court are of opinion, that the law is for the United States, then the jurors aforesaid do find the defendants, and every of them, guilty; but if the court are of opinion that the law is for the defendants, then they find the defendants not guilty.

At a subsequent day, judgment was entered on the verdict in favour of the United States, and Gen. Bright was sentenced to be imprisoned for three months and to pay a fine of $200; and the other defendants to one month's imprisonment and a fine of $50 each; but they were immediately pardoned by the president of the United States.