# WELCH *v.* TEXAS DEPARTMENT OF HIGHWAYS AND PUBLIC TRANSPORTATION, ET AL.

No. 85–1716.   Argued March 4, 1987—Decided June 25, 1987

POWELL, J., announced the judgment of the Court and delivered an opinion in which REHNQUIST, C. J., and WHITE and O'CONNOR, JJ., joined. WHITE, J., filed a concurring opinion, *post*, p. 495. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 495. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 496.

*Michael D. Cucullu* argued the cause and filed a brief for petitioner.

*F. Scott McCown,* Special Assistant Attorney General of Texas, argued the cause for respondents. With him on the brief were *Jim Mattox,* Attorney General, *Mary F. Keller,* Executive Assistant Attorney General, and *Dudley Fowler,* Assistant Attorney General.*

JUSTICE POWELL announced the judgment of the Court and delivered an opinion in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR join.

The question in this case is whether the Eleventh Amendment bars a state employee from suing the State in federal court under the Jones Act, ch. 250, 41 Stat. 1007, 46 U. S. C. § 688.

I

The Texas Department of Highways and Public Transportation operates a free automobile and passenger ferry be-

*Robert M. Weinberg, Julia Penny Clark, David M. Silberman, Laurence Gold,* and *George Kaufmann* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

*Benna Ruth Solomon, Beate Bloch,* and *Clifton S. Elgarten* filed a brief for the Council of State Governments et al. as *amici curiae* urging affirmance.

tween Point Bolivar and Galveston, Texas. Petitioner Jean Welch, an employee of the State Highway Department, was injured while working on the ferry dock at Galveston. Relying on § 33 of the Jones Act, 46 U. S. C. § 688, she filed suit in the Federal District Court for the Southern District of Texas against the Highway Department and the State of Texas.[1]

The District Court dismissed the action as barred by the Eleventh Amendment. 533 F. Supp. 403, 407 (1982). A divided panel of the Court of Appeals for the Fifth Circuit reversed, with each judge writing separately. 739 F. 2d 1034 (1984). On rehearing en banc, the Court of Appeals affirmed the judgment of the District Court. 780 F. 2d 1268 (1986). The court recognized that *Parden* v. *Terminal Railway of Alabama Docks Dept.*, 377 U. S. 184 (1964), held that an employee of a state-operated railroad company may bring an action in federal court under the Federal Employers' Liability Act (FELA), 53 Stat. 1404, 45 U. S. C. §§ 51–60. *Parden* is relevant to this case because the Jones Act applied the remedial provisions of the FELA to seamen. See 46 U. S. C. § 688(a). The court nevertheless concluded that "the broad sweep of the *Parden* decision, although it has not been overruled, has overtly been limited by later decisions as its full implications have surfaced." 780 F. 2d, at 1270. The court relied on our holding that "Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute." *Atascadero State Hospital* v.

---

[1] Section 33 of the Jones Act provides in part:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply . . . . Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located." 46 U. S. C. § 688(a).

*Scanlon*, 473 U. S. 234, 242 (1985).[2] The Court of Appeals found no unmistakable expression of such an intention in the Jones Act. The court also held that Texas has not consented to suit under the Jones Act. 780 F. 2d, at 1273–1274 (citing *Lyons* v. *Texas A & M University*, 545 S. W. 2d 56 (Tex. Civ. App. 1976), writ refused, n.r.e. We granted certiorari, 479 U. S. 811 (1986), and now affirm.

II

The Eleventh Amendment provides:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

The Court has recognized that the significance of the Amendment "lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III" of the Constitution. *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 98 (1984) *(Pennhurst II)*. Accordingly, as discussed more fully in Part V of this opinion, the Court long ago held that the Eleventh Amendment bars a citizen from bringing suit against the citizen's own State in federal court, even though the express terms of the Amendment refer only to suits by citizens of another State. *Hans* v. *Louisiana*, 134 U. S. 1, 10 (1890). See *Edelman* v. *Jordan*, 415 U. S. 651, 662–663 (1974); *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S. 279, 280 (1973). For the same reason, the Court has

---

[2] The question in *Scanlon* was whether § 504 of the Rehabilitation Act of 1973, 29 U. S. C. § 794, makes state agencies subject to suits for retroactive monetary relief in federal court. The Rehabilitation Act was passed pursuant to § 5 of the Fourteenth Amendment. *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 244–245, n. 4 (1985). Congress therefore had the power to subject unconsenting States to suit in federal court. See *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976).

held that the Amendment bars suits in admiralty against the States, even though such suits are not, strictly speaking, "suits in law or equity." *Ex parte New York, No. 1,* 256 U. S. 490, 497 (1921) (Eleventh Amendment bars *in personam* actions against a State by its citizens); *Ex parte New York, No. 2,* 256 U. S. 503 (1921) (Eleventh Amendment bars actions *in rem* against vessel owned by the State and employed exclusively for governmental purposes). See *Florida Dept. of State* v. *Treasure Salvors, Inc.,* 458 U. S. 670, 683, n. 17 (1982) (plurality opinion of STEVENS, J.); *id.,* at 706–710 (WHITE, J., concurring in judgment in part and dissenting in part). See *infra,* at 488–490.[3]

The Court has recognized certain exceptions to the reach of the Eleventh Amendment. If a State waives its immunity and consents to suit in federal court, the suit is not barred by the Eleventh Amendment. *Clark* v. *Barnard,* 108 U. S. 436, 447 (1883). But, because "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights," *Edelman* v. *Jordan,* 415 U. S., at 673, the Court will find a waiver by the State "only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Ibid.* (quoting *Murray* v. *Wilson Distilling Co.,* 213 U. S. 151, 171 (1909)). Moreover, "[a] State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Pennhurst II,* 465 U. S., at 99 (emphasis in original). Thus, a State does not waive Eleventh Amendment immunity in fed-

---

[3] In *Florida Dept. of State* v. *Treasure Salvors, Inc.,* 458 U. S. 670 (1982), eight Members of the Court agreed that the Eleventh Amendment bars suits in admiralty brought to recover damages from the State or its officials. *Id.,* at 698–699 (plurality opinion of STEVENS, J.); *id.,* at 706–710 (WHITE, J., concurring in judgment in part and dissenting in part). An action under the Jones Act unquestionably is an action to recover damages from the State.

eral courts merely by waiving sovereign immunity in its own courts. *Id.*, at 99, n. 9.

We also have recognized that the Eleventh Amendment "necessarily [is] limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Fitzpatrick* v. *Bitzer,* 427 U. S. 445, 456 (1976). Consequently, Congress can abrogate the Eleventh Amendment without the States' consent when it acts pursuant to its power "'to enforce, by appropriate legislation' the substantive provisions of the Fourteenth Amendment." *Ibid.* (quoting U. S. Const., Amdt. 14, § 5). As the Court of Appeals noted in this case, we have required that "Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." *Atascadero State Hospital* v. *Scanlon,* 473 U. S., at 243. We have been unwilling to infer that Congress intended to negate the States' immunity from suit in federal court, given "the vital role of the doctrine of sovereign immunity in our federal system." *Pennhurst II, supra,* at 99. Moreover, the courts properly are reluctant to infer that Congress has expanded our jurisdiction. See *American Fire & Casualty Co.* v. *Finn,* 341 U. S. 6, 17 (1951) ("The jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation").

## III

We now apply these principles to the Jones Act. We note that the question whether the State of Texas has waived its Eleventh Amendment immunity is not before us. Both the District Court and the Court of Appeals held that the State has not consented to Jones Act suits in federal court. The petition for certiorari does not address this issue, and we do not regard it as fairly included in the questions on which certiorari was granted.[4] Indeed, at oral argument counsel for

---

[4] The questions presented in the petition for certiorari are:

"1. Whether the State Department of Highways and the State of Texas are immune from a Jones Act suit in U. S. District Court by a state

petitioner conceded that the question of express waiver by the State "is not before the Court . . . ." Tr. of Oral Arg. 18. We therefore have no occasion to consider petitioner's argument in her brief on the merits that the Texas Tort Claims Act, Tex. Rev. Civ. Stat. Ann., Art. 6252–19 (Vernon, 1970, as amended 1973 Tex. Gen. Laws, ch. 50) constitutes an express waiver of the State's Eleventh Amendment immunity. Brief for Petitioner 29–34. We accept the holdings of the Court of Appeals and the District Court that it does not.

Petitioner's remaining argument is that Congress has abrogated the States' Eleventh Amendment immunity from suit under the Jones Act. We assume, without deciding or intimating a view of the question, that the authority of Congress to subject unconsenting States to suit in federal court is not confined to §5 of the Fourteenth Amendment. See *County of Oneida* v. *Oneida Indian Nation of New York*, 470 U. S. 226, 252 (1985).[5] Petitioner's argument fails in any event because Congress has not expressed in unmistakable statutory language its intention to allow States to be sued in federal court under the Jones Act. It is true that the Act extends to "*[a]ny* seaman who shall suffer personal injury in the course of his employment," §33 (emphasis added). But the Eleventh Amendment marks a constitutional distinction between the States and other employers of

_____

employee/seaman by operation of the Eleventh Amendment to the U. S. Constitution.

"2. Whether the doctrine of implied waiver of sovereign immunity as set forth in *Parden* v. *Terminal R. R. Co.*, 377 U. S. 184 (1964) is still viable." Pet. for Cert. i (parallel citations omitted).

[5] The argument for such an authority starts from the proposition that the Constitution authorizes Congress to regulate matters within the admiralty and maritime jurisdiction, either under the Commerce Clause or the Necessary and Proper Clause. See D. Robertson, Admiralty and Federalism 142–145 (1970). By ratifying the Constitution, the argument runs, the States necessarily consented to suit in federal court with respect to enactments under either Clause.

seamen. Because of the role of the States in our federal system, "[a] general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Atascadero State Hospital* v. *Scanlon, supra*, at 246. See *Quern* v. *Jordan*, 440 U. S. 332, 342 (1979). See also *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S., at 285. In *Scanlon* the Court held that § 504 of the Rehabilitation Act of 1973, 29 U. S. C. § 794, which provides remedies for "any recipient of Federal assistance," does not contain the unmistakable language necessary to negate the States' Eleventh Amendment immunity. For the same reasons, we hold today that the general language of the Jones Act does not authorize suits against the States in federal court.[6]

## IV

In *Parden* v. *Terminal Railway of Alabama Docks Dept.*, 377 U. S. 184 (1964), the Court considered whether an employee of a state-owned railroad could sue the State in federal court under the FELA. The Court concluded that the State of Alabama had waived its Eleventh Amendment immunity. *Id.*, at 186. It reasoned that Congress evidenced an intention to abrogate Eleventh Amendment immunity by making the FELA applicable to "every common carrier by railroad while engaging in commerce between any of the several States . . . ." § 1, 35 Stat. 65, 45 U. S. C. § 51. The Court mistakenly relied on cases holding that general language in the Safety Appliance Act, §§ 2, 6, and the Railway Labor Act, § 151 *et seq.*, made those statutes applicable to the

---

[6] Because Eleventh Amendment immunity "partakes of the nature of a jurisdictional bar," *Edelman* v. *Jordan*, 415 U. S. 651, 678 (1974), we have no occasion to consider the State's additional argument that Congress did not intend to afford seamen employed by the States a remedy under the Jones Act.

States.[7] It reasoned that it "should not presume to say, in the absence of express provision to the contrary, that [Congress] intended to exclude a particular group of [railroad] workers from the benefits conferred by the Act." *Parden* v. *Terminal Railway of Alabama Docks Dept., supra,* at 190. But, as discussed above, the constitutional role of the States sets them apart from other employers and defendants. *Atascadero State Hospital* v. *Scanlon,* 473 U. S., at 246; *Pennhurst II,* 465 U. S., at 99; *Edelman* v. *Jordan,* 415 U. S., at 673; *Quern* v. *Jordan, supra,* at 342–343; *Employees* v. *Missouri Dept. of Public Health and Welfare, supra.* As the dissenting opinion in *Parden* states:

> "It should not be easily inferred that Congress, in legislating pursuant to one article of the Constitution, intended to effect an automatic and compulsory waiver of rights arising under another. Only when Congress has clearly considered the problem and expressly declared that any State which undertakes given regulable conduct will be deemed thereby to have waived its immunity should courts disallow the invocation of this defense." 377 U. S., at 198–199 (WHITE, J., dissenting).

---

[7] As the dissenting opinion in *Parden* observed, these cases do not support the Court's holding on the Eleventh Amendment issue. 377 U. S., at 200, n. 2 (WHITE, J., dissenting, joined by Douglas, Harlan, and Stewart, JJ.). *California* v. *Taylor,* 353 U. S. 553 (1957), was a suit against the National Railroad Adjustment Board that expressly reserved the Eleventh Amendment question. *Id.,* at 568, n. 16 ("The contention of the State that the Eleventh Amendment . . . would bar an employee . . . from enforcing an award . . . in a suit against the State in a United States District Court . . . is not before us under the facts of this case"). *United States* v. *California,* 297 U. S. 175 (1936), was a suit brought by the United States, against which the States are not entitled to assert sovereign immunity. See *United States* v. *Mississippi,* 380 U. S. 128, 140–141 (1965). Finally, *Petty* v. *Tennessee-Missouri Bridge Comm'n,* 359 U. S. 275, 280–282 (1959), involved an interstate compact that expressly permitted the bistate corporation to sue and be sued.

Although our later decisions do not expressly overrule *Parden*, they leave no doubt that *Parden's* discussion of congressional intent to negate Eleventh Amendment immunity is no longer good law. In *Employees* v. *Missouri Dept. of Public Health and Welfare* the Court emphasized that "*Parden* was premised on the conclusion that [the State] . . . had consented to suit in the federal courts . . . ." 411 U. S., at 281, n. 1. The Court refused to extend the reasoning of *Parden* to "infer that Congress in legislating pursuant to the Commerce Clause, which has grown to vast proportions in its applications, desired silently to deprive the States of an immunity they have long enjoyed under another part of the Constitution." *Id.*, at 285. In subsequent cases the Court consistently has required an unequivocal expression that Congress intended to override Eleventh Amendment immunity. *Atascadero State Hospital* v. *Scanlon, supra,* at 242; *Pennhurst II, supra,* at 99; *Quern* v. *Jordan, supra,* at 342–345. Accordingly, to the extent that *Parden* v. *Terminal Railway, supra,* is inconsistent with the requirement that an abrogation of Eleventh Amendment immunity by Congress must be expressed in unmistakably clear language, it is overruled.[8]

V

Today, for the fourth time in little more than two years, see *Papasan* v. *Allain,* 478 U. S. 265, 293 (1986) (BRENNAN, J., concurring in part and dissenting in part); *Green* v. *Mansour,* 474 U. S. 64, 74 (1985) (BRENNAN, J., dissenting); *Atascadero State Hospital* v. *Scanlon, supra,* at 247 (BRENNAN, J., dissenting), four Members of the Court urge that we overrule *Hans* v. *Louisiana,* 134 U. S. 1 (1890), and the long line of cases that has followed it. The rule of law depends in

---

[8] As discussed, *supra,* at 475 and n. 5, we have no occasion in this case to consider the validity of the additional holding in *Parden,* that Congress has the power to abrogate the States' Eleventh Amendment immunity under the Commerce Clause to the extent that the States are engaged in interstate commerce.

large part on adherence to the doctrine of *stare decisis*. Indeed, the doctrine is "a natural evolution from the very nature of our institutions." Lile, Some Views on the Rule of *Stare Decisis*, 4 Va. L. Rev. 95, 97 (1916). It follows that "any departure from the doctrine of *stare decisis* demands special justification." *Arizona* v. *Rumsey*, 467 U. S. 203, 212 (1984). Although the doctrine is not rigidly observed in constitutional cases, "[w]e should not be . . . unmindful, even when constitutional questions are involved, of the principle of *stare decisis*, by whose circumspect observance the wisdom of this Court as an institution transcending the moment can alone be brought to bear on the difficult problems that confront us." *Green* v. *United States*, 355 U. S. 184, 215 (1957) (Frankfurter, J., dissenting). Despite these time-honored principles, the dissenters—on the basis of ambiguous historical evidence—would flatly overrule a number of major decisions of the Court, and cast doubt on others. See n. 27, *infra*. Once again, the dissenters have placed in issue the fundamental nature of our federal system.[9]

A

The constitutional foundation of state sovereign immunity has been well described by JUSTICE MARSHALL in his separate opinion in *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S. 279 (1973):

"It had been widely understood prior to ratification of the Constitution that the provision in Art. III, § 2, concerning 'Controversies . . . between a State and Citizens of another State' would not provide a mechanism for making States unwilling defendants in federal court. The Court in *Chisholm*, however, considered the plain meaning of the constitutional provision to be controlling.

---

[9] We address today only two principal arguments raised by the dissent: that citizens may bring federal-question actions against the States in federal court, see *infra*, at 480–488, and that citizens may bring admiralty suits against the States, see *infra*, at 488–493.

The Eleventh Amendment served effectively to reverse the particular holding in *Chisholm,* and, more generally, to restore the original understanding, see, *e. g., Hans* v. *Louisiana . . . .* Thus, despite the narrowness of the language of the Amendment, its spirit has consistently guided this Court in interpreting the reach of the federal judicial power generally, and 'it has become established by repeated decisions of this court that the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given: not one brought by citizens of another State, or by citizens or subjects of a foreign State, because of the Eleventh Amendment; and not even one brought by its own citizens, because of the fundamental rule of which the Amendment is but an exemplification.'" *Id.,* at 291–292 (MARSHALL, J., concurring in result) (citations omitted).

Although the dissent rejects the Court's reading of the historical record, there is ample support for the Court's rationale, which has provided the basis for many important decisions.

1

JUSTICE BRENNAN has argued at length that "[a] close examination of the historical records" demonstrates that "[t]here simply is no constitutional principle of state sovereign immunity." *Atascadero State Hospital* v. *Scanlon,* 473 U. S., at 259 (dissenting opinion). In his dissent today, he repeats and expands this historical argument. *Post,* at 504–516. The dissent concedes, as it must, that three of the most prominent supporters of the Constitution—Madison, Hamilton, and Marshall—took the position that unconsenting States would not be subject to suit in federal court.[10] The

---

[10] Madison, Hamilton, and Marshall took this position in response to suggestions that the Clause in Article III, § 2, extended the federal judicial power to controversies "between a State and Citizens of another

Court has relied on these statements in the past. See *Edelman* v. *Jordan*, 415 U. S., at 660–662, n. 9; *Monaco* v. *Mississippi*, 292 U. S. 313, 323–325 (1934); *Hans* v. *Louisiana*, 134

State." James Madison, often described as the "father of the Constitution," addressed the effect of the first Clause during the Virginia Convention:

"[The Supreme Court's] jurisdiction in controversies between a state and citizens of another state is much objected to, and perhaps without reason. It is not in the power of individuals to call any state into court. The only operation [the Clause] can have, is that, if a state should wish to bring a suit against a citizen, it must be brought before the federal court.

.        .        .        .

"It appears to me that this [Clause] can have no operation but this—to give a citizen a right to be heard in the federal courts; and if a state should condescend to be a party, this court may take cognizance of it." 3 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 533 (2d ed. 1861).

The same day, John Marshall said to the Virginia Convention:

"I hope that no gentleman will think that a state will be called to the bar of the federal court. Is there no such case at present? Are there not many cases in which the legislature of Virginia is a party, and yet the state is not sued? It is not rational to suppose that the sovereign power should be dragged before a court. The intent is, to enable states to recover claims of individuals residing in other states. I contend this construction is warranted by the words. . . . I see a difficulty in making a state defendant, which does not prevent its being plaintiff." *Id.*, at 555–556.

Later that year, Alexander Hamilton wrote in The Federalist:

"It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent*. This is the general sense, and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union. . . . [T]here is no color to pretend that the State governments would, by the adoption of that plan, be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith. . . . To what purpose would it be to authorize suits against States for the debts they owe? How could recoveries be enforced? It is evident, it could not be done without waging war against the contracting State; and to ascribe to the federal courts, by mere implication, and in destruction of a pre-existing right of the State governments, a power which would involve such a consequence, would be altogether forced and unwarrantable." The Federalist No. 81, pp. 548–549 (J. Cooke ed. 1961) (emphasis in original).

U. S., at 12–14. Although the dissenters would read these statements to apply only to cases in which no federal question is presented, see *post*, at 504–509; *Atascadero State Hospital* v. *Scanlon*, *supra*, at 268, 276–278, the statements themselves do not suggest such a limitation.[11]  Moreover, the delicate problem of enforcing judgments against the States, that was raised by both Federalists and anti-Federalists, would have arisen in cases presenting a federal question as well as in other cases.

It is true, as the Court observed in *Hans*, *supra*, at 14, that opinions on this question differed during the ratification debates.  Among those who disagreed with Madison, Hamilton, and Marshall were Edmund Randolph and James Wilson, both of whom supported ratification.[12]  Opponents of

---

[11] The dissent relies heavily on later statements in Chief Justice Marshall's opinions for the Court in *Cohens* v. *Virginia*, 6 Wheat. 264, 382–383, 412 (1821), and *Osborn* v. *Bank of the United States*, 9 Wheat. 738, 857–858 (1824).   Of course the possibility that Marshall changed his views on sovereign immunity after the Constitution was ratified, or espoused a broader view of sovereign immunity only to secure ratification, does not imply that the views he expressed at the Virginia Convention should be disregarded. In any event, the dissent places too much weight on *Cohens* and *Osborn*. In *Cohens*, it was the State that began criminal proceedings against the Cohenses.   It had long been understood that sovereign immunity did not prevent persons convicted of crimes from appealing.   See D. Currie, The Constitution and the Supreme Court, 1789–1888, p. 99 (1985).   Accordingly, Chief Justice Marshall's opinion in *Cohens* distinguished a writ of error, which is but "a continuation of the same suit," from an independent suit against the State.   6 Wheat., at 409.   Thus, as the Court properly noted in both *Hans* v. *Louisiana*, 134 U. S. 1, 19 (1890), and *Monaco* v. *Mississippi*, 292 U. S. 313, 327 (1934), the statements quoted in today's dissent were unnecessary to the decision in *Cohens*.   In *Osborn*, the Court held that the Eleventh Amendment did not apply to a suit against a state official, a holding that is not at issue today.   Thus, the statement quoted by the dissent, *post*, at 509, is dictum.

[12] Both Wilson and Randolph had served on the Committee of Detail that added the Clause in Article III, § 2, extending the judicial power to controversies between a State and citizens of another State.   As a Member of the Court, Wilson sided with the majority in *Chisholm* v. *Georgia*, 2 Dall. 419

ratification, including Patrick Henry, George Mason, and Richard Henry Lee, feared that the Constitution would make unconsenting States subject to suit in federal court. Despite the strong rhetoric in the dissent, these statements fall far short of demonstrating a consensus that ratification of the Constitution would abrogate the sovereign immunity of the States. Indeed, the representations of Madison, Hamilton, and Marshall that the Constitution did *not* abrogate the States' sovereign immunity may have been essential to ratification.[13] For example, the New York Convention appended to its ratification resolution a declaration of understanding that "the Judicial Power of the United States in cases in which a State may be a party, does not extend to criminal Prosecutions, or to authorize any Suit by any Person against a State." 2 Documentary History of the Constitution of the United States of America 194 (1894).[14] At most,

---

(1793). Randolph, while Attorney General of the United States, argued the case for Chisholm.

[13] A leading historian has concluded:

"The right of the Federal Judiciary to summon a State as defendant and to adjudicate its rights and liabilities had been the subject of deep apprehension and of active debate at the time of the adoption of the Constitution; but the existence of any such right had been disclaimed by many of the most eminent advocates of the new Federal Government, and it was largely owing to their successful dissipation of the fear of the existence of such Federal power that the Constitution was finally adopted." 1 C. Warren, The Supreme Court in United States History 91 (1923).

[14] The New York Convention also stated its understanding that "every Power, Jurisdiction and right, which is not by the said Constitution clearly delegated to the Congress of the United States, or the departments of the Government thereof, remains to the People of the several States, or to their respective State Governments to whom they may have granted the same." 2 Documentary History of the Constitution of the United States of America 191 (1894). This view later was embodied in the Tenth Amendment, which reserves to the States, or to the people, powers not delegated to the United States by the Constitution. Of course, the Constitution does not expressly abrogate the sovereign immunity of the States. Thus the principle that States cannot be sued without their consent is broadly consistent with the Tenth Amendment.

then, the historical materials show that—to the extent this question was debated—the intentions of the Framers and Ratifiers were ambiguous.

2

No one doubts that the Eleventh Amendment nullified the Court's decision in *Chisholm* v. *Georgia*, 2 Dall. 419 (1793). *Chisholm* was an original action in assumpsit, filed by the South Carolina executor of a South Carolina estate, to recover money owed to the estate by Georgia. The Court held, over a dissent by Justice Iredell, that it had jurisdiction. The reaction to *Chisholm* was swift and hostile. The Eleventh Amendment passed both Houses of Congress by large majorities in 1794. Within two years of the *Chisholm* decision, the Eleventh Amendment was ratified by the necessary 12 States.[15]

The dissent, observing that jurisdiction in *Chisholm* itself was based solely on the fact that Chisholm was not a citizen of Georgia, argues that the Eleventh Amendment does not apply to cases presenting a federal question.[16] The text of the Amendment states that "[t]he Judicial power of the

---

[15] President Adams did not notify Congress that the Amendment had been ratified by the necessary three-fourths of the States until January 1798. 1 J. Richardson, Messages and Papers of the Presidents 260 (1899).

[16] The dissent states that Justice Iredell's dissenting opinion in *Chisholm* v. *Georgia* is "generally regarded as embodying the rationale of the Eleventh Amendment." *Post*, at 513. As the dissent itself observes, *post*, at 515–516, Justice Iredell's opinion rests primarily on the absence of a *statutory* provision conferring jurisdiction on the Court in cases such as Chisholm's. To the extent that Justice Iredell discussed the constitutional question, his opinion is consistent with the more recent decisions of this Court:

"So much, however, has been said on the Constitution, that it may not be improper to intimate that my present opinion is strongly against any construction of it, which will admit, *under any circumstances*, a compulsive suit against the State for the recovery of money." 2 Dall., at 449 (emphasis added).

The dissent does not attempt to explain these remarks, except to observe that they were unnecessary to Justice Iredell's decision.

United States *shall not be construed* to extend to *any* suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." (Emphasis added.) Federal-question actions unquestionably are suits "in law or equity"; thus the plain language of the Amendment refutes this argument.[17] Nor does the dissenting opinion offer any satisfactory explanation for the rejection, by an overwhelming margin, of an amendment offered by Senator Gallatin that would have allowed citizens to sue the States for causes of action arising under treaties.[18]

---

[17] The dissent's principal textual argument rests on the similarity between the language of the Amendment and the language of the State-Citizen Diversity Clauses in Article III. See *Atascadero State Hospital* v. *Scanlon*, 473 U. S., at 286–287 (BRENNAN, J., dissenting). This argument cannot explain why Congress chose to apply the Amendment to "any suit in law or equity" rather than any suit where jurisdiction is predicated solely on diversity of citizenship. Instead, the dissent reads the Amendment to accomplish even less than its plain language suggests. As the Court long has recognized, the speed and vigor of the Nation's response to *Chisholm* suggests that the Eleventh Amendment should be construed broadly so as to further the federal interests that the Court misapprehended in *Chisholm*. The dissent also has some difficulty explaining the Clause in Article III, § 2, that extends the federal judicial power "to Controversies to which the United States shall be a Party." Although arguments analogous to those in the dissent would suggest that this Clause abrogated the sovereign immunity of the United States, the dissent stops short of such an extreme conclusion.

[18] In an effort to explain the overwhelming rejection of Gallatin's amendment, the dissent suggests that Congress would have enumerated all the Article III heads of jurisdiction if it had intended to bar federal-question actions against the States. *Atascadero State Hospital* v. *Scanlon*, 473 U. S., at 287, n. 40. The dissent also speculates, without citing a shred of historical evidence, that the Senate may have rejected the proposed amendment to avoid giving the impression that it was barring federal-question actions *not* based on a treaty. Finally, the dissent observes that federal courts had no general original federal-question jurisdiction under the Judiciary Act of 1789. The dissent thus implies that the question was regarded as unimportant at the time. But the dissent also concedes that Senator Gallatin's proposed amendment was so unpopular that its adoption

3

The Court's unanimous decision in *Hans* v. *Louisiana*, 134 U. S. 1 (1890), firmly established that the Eleventh Amendment embodies a broad constitutional principle of sovereign immunity. Hans, a citizen of Louisiana, brought an action against the State in federal court alleging that its failure to pay interest on certain bonds violated the Contract Clause. The Court considered substantially the same historical materials relied on by the dissent and unanimously held that the action was barred by the doctrine of sovereign immunity. Justice Bradley's opinion for the Court observed:

> "Suppose that Congress, when proposing the Eleventh Amendment, had appended to it a proviso that nothing therein contained should prevent a State from being sued by its own citizens in cases arising under the Constitution or laws of the United States: can we imagine that it would have been adopted by the States? The supposition that it would is almost an absurdity on its face." *Id.*, at 15.

In a short concurring opinion, Justice Harlan agreed with the other eight Members of the Court that "a suit directly against a State by one of its own citizens is not one to which the judicial power of the United States extends, unless the State itself consents to be sued." *Id.*, at 21.

Contrary to the suggestion in the dissent, *post*, at 519, the fundamental principle enunciated in *Hans* has been among the most stable in our constitutional jurisprudence. Moreover, the dissent is simply wrong in asserting that the doctrine lacks a clear rationale, *post*, at 519. Because of the sensitive problems "inherent in making one sovereign appear against its will in the courts of the other," *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S., at 294 (MARSHALL, J., concurring in result), the doctrine of sovereign im-

---

might have resulted in a constitutional convention. *Ibid.* This concession hardly is consistent with the dissent's assertion that adoption of the Gallatin amendment would have had no practical significance.

munity plays a vital role in our federal system. The contours of state sovereign immunity are determined by the structure and requirements of the federal system. The rationale has been set out most completely in the Court's unanimous opinion, per Chief Justice Hughes, in *Monaco* v. *Mississippi*, 292 U. S. 313 (1934). First, the United States may sue a State, because that is "inherent in the Constitutional plan." *Id.*, at 329. Absent such a provision, "'the permanence of the Union might be endangered.'" *Ibid.* (quoting *Oklahoma* v. *Texas*, 258 U. S. 574, 581 (1922)). Second, States may sue other States, because a federal forum for suits between States is "essential to the peace of the Union." *Monaco* v. *Mississippi, supra*, at 328. Third, States may not be sued by foreign states, because "[c]ontroversies between a State and a foreign State may involve international questions in relation to which the United States has a sovereign prerogative." 292 U. S., at 331. Fourth, the Eleventh Amendment established "an absolute bar" to suits by citizens of other States or foreign states. *Id.*, at 329. Finally, "[p]rotected by the same fundamental principle [of sovereign immunity], the States, in the absence of consent, are immune from suits brought against them by their own citizens . . . ." *Ibid.* The Court has never questioned this basic framework set out in *Monaco* v. *Mississippi*.

The dissenters offer their unsupported view that the principle of sovereign immunity is "'pernicious'" because it assertedly protects States from the consequences of their illegal conduct and prevents Congress from "'tak[ing] steps it deems necessary and proper to achieve national goals within its constitutional authority.'" *Post*, at 521 (quoting *Atascadero State Hospital* v. *Scanlon*, 473 U. S., at 302 (BRENNAN, J., dissenting)). Of course, the dissent's assertion that our cases construing the Eleventh Amendment deprive Congress of some of its constitutional power is simply question-begging. Moreover, as noted *supra*, at 475, Congress clearly has authority to limit the Eleventh Amendment when

it acts to enforce the Fourteenth Amendment. *Fitzpatrick* v. *Bitzer,* 427 U. S., at 456. The dissent's statement that sovereign immunity "protect[s] the States from the consequences of their illegal conduct" erroneously suggests that aggrieved individuals are left with no remedy for harmful state actions. Relief often may be obtained through suits against state officials rather than the State itself, or through injunctive or other prospective remedies. *Edelman* v. *Jordan,* 415 U. S. 651 (1974). Municipalities and other local government agencies may be sued under 42 U. S. C. § 1983. *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978). In addition, the States may provide relief by waiving their immunity from suit in state court on state-law claims.[19] That States are not liable in other circumstances is a necessary consequence of their role in a system of dual sovereignties. Although the dissent denies that sovereign immunity is "'required by the structure of the federal system,'" *post,* at 520 (quoting *Atascadero, supra,* at 302), the principle has been deeply embedded in our federal system from its inception.

## B

As a fallback position, the dissent argues that the doctrine of sovereign immunity has no application to suits in admiralty against unconsenting States. *Post,* at 497–504. This argument also is directly contrary to long-settled authority, as well as the Court's recognition that the Eleventh Amendment affirms "the fundamental principle of sovereign immunity," *Pennhurst II,* 465 U. S., at 98; *Monaco* v. *Mississippi, supra,* at 329.

## 1

In *Ex parte New York, No. 1,* 256 U. S. 490 (1921), a unanimous Court held that unconsenting States are immune from

---

[19] In this case, for example, Welch is not without a remedy: She may file a workers' compensation claim against the State under the Texas Tort Claims Act, ch. 292, 1969 Tex. Gen. Laws 874, amended by ch. 50, 1973 Tex. Gen. Laws 77. See Brief for Respondents 34–35.

*in personam* suits in admiralty brought by private citizens.[20] Today the dissent asserts that the Court's opinion in *Ex parte New York, No. 1,* "did not attempt to justify its obliteration" of the traditional distinction between admiralty cases and cases in law or equity. *Post,* at 500. On the contrary, the Court expressly recognized the distinction, see 256 U. S., at 497, and provided a reasoned basis for its holding:

> "That a State may not be sued without its consent is a fundamental rule of jurisprudence having so important a bearing upon the construction of the Constitution of the United States that it has become established by repeated decisions of this court that the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given: not one brought by citizens of another State, or by citizens or subjects of a foreign State, because of the Eleventh Amendment; and not even one brought by its own citizens, because of the fundamental rule of which the Amendment is but an exemplification." *Ibid.* (citations omitted).

The Court has adhered to this rule in subsequent cases. *In re New York, No. 2,* 256 U. S. 503 (1921), held that a private citizen may not bring an admiralty action *in rem* against a vessel owned by a State. The Court concluded that " '[t]o permit a creditor to seize and sell [a government-owned vessel] to collect his debt would be to permit him in some degree to destroy the government itself.' " *Id.,* at 511 (quoting *Klein* v. *New Orleans,* 99 U. S. 149, 150 (1879)).[21] More re-

---

[20] The opinion was written by Justice Pitney for a strong Court that included Justices Holmes and Brandeis. Chief Justice White, who died 13 days before the decision was announced, presumably concurred in the result and the reasoning.

[21] The dissent insists that *In re New York, No. 2,* does not support our holding. *Post,* at 500–501, n. 5. As noted *supra,* at 473, n. 3, eight Members of the Court recently have thought otherwise. In *Florida Dept. of State* v. *Treasure Salvors, Inc.,* 458 U. S. 670 (1982), JUSTICE STEVENS'

cently, in *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S. 670 (1982), eight Members of the Court reaffirmed the settled rule that the Eleventh Amendment bars admiralty actions against the State or its officials seeking damages to be paid from the state treasury. *Id.*, at 698–699 (opinion of STEVENS, J.); *id.*, at 706–710 (WHITE, J., concurring in judgment in part and dissenting in part). To be sure, JUSTICE STEVENS' opinion states that "we need not decide the extent to which a federal district court exercising admiralty *in rem* jurisdiction over property before the court may adjudicate the rights of claimants to that property as against sovereigns that did not appear and voluntarily assert any claim that they had to the res." *Id.*, at 697. Of course, that statement has no application to an action *in personam*, such as Welch's suit under the Jones Act.[22]

### 2

The dissent suggests that *In re New York, No. 1*, decided in 1921, overruled settled law to the effect that the Constitution does not bar private citizens from bringing admiralty

---

opinion, joined by Chief Justice Burger and JUSTICES MARSHALL and BLACKMUN, explains that *In re New York, No. 2*, holds:

"[A]n action—otherwise barred as an *in personam* action against the State—cannot be maintained through seizure of property owned by the State. Otherwise, the Eleventh Amendment could easily be circumvented; an action for damages could be brought simply by first attaching property that belonged to the State and then proceeding *in rem*." 458 U. S., at 699.

JUSTICE WHITE's opinion in *Treasure Salvors*, joined by JUSTICES POWELL, REHNQUIST, and O'CONNOR, reads *In re New York, No. 2*, even more broadly, as holding that "sovereign immunity bars process against a res in the hands of state officers." 458 U. S., at 709.

[22] The dissent suggests that a distinction may exist between admiralty suits based on a statute and other admiralty suits against the States. The only argument the dissent advances in favor of this distinction is that "admiralty is not mentioned in the Eleventh Amendment." *Post*, at 502. But that observation—as well as the arguments that the Eleventh Amendment embodies a principle of sovereign immunity—applies to all admiralty suits. The perceived distinction is simply unsound.

suits against the States. *Post,* at 500. The dissent concedes that the Court "'did not pass on the applicability of the Eleventh Amendment in admiralty'" prior to 1921. *Post,* at 499 (citation omitted). It nevertheless asserts that dicta in *United States* v. *Peters,* 5 Cranch 115 (1809), and *Governor of Georgia* v. *Madrazo,* 1 Pet. 110 (1828), support the "holding" of *United States* v. *Bright,* 24 Fed. Cas. 1232 (No. 14,647) (CC Pa. 1809), that the Eleventh Amendment does not apply to suits in admiralty. In fact these early cases cast considerable doubt on the dissent's position.

*United States* v. *Peters* was a suit against the heirs of David Rittenhouse, who had served as treasurer of the State of Pennsylvania during the Revolutionary War. While Rittenhouse was treasurer, the State had seized a British vessel and sold it as a prize of war. Rittenhouse had deposited most of the proceeds in his own account, and had not turned them over to the State at the time of his death. Chief Justice Marshall's opinion for the Court turned on the facts that "the suit was not instituted against the state, or its treasurer, but against the executrixes of David Rittenhouse," and that the State "had neither possession of, nor right to, the property." 5 Cranch, at 139–141. Indeed, language in the Court's opinion suggests that an action against the State would have been barred by the Eleventh Amendment:

> "The [eleventh] amendment simply provides, that no suit shall be commenced or prosecuted against a state. The state cannot be made a defendant to a suit brought by an individual; but it remains the duty of the courts of the United States to decide all cases brought before them by citizens of one state against citizens of a different state, where a state is not necessarily a defendant." *Id.,* at 139.

Thus, *Peters* does not support the dissenters' position.[23]

---

[23] The trial in *United States* v. *Bright,* 24 Fed. Cas. 1232 (No. 14,647) (CC Pa. 1809), occurred *after* the Court's decision in *Peters. Peters* there-

The dissent's reliance on *Governor of Georgia* v. *Madrazo*, *supra*, also is misplaced. Madrazo, a Spanish subject, sued the Governor of Georgia in admiralty to obtain possession of a cargo of slaves or the proceeds from their sale. Chief Justice Marshall's opinion for the Court held that the Eleventh Amendment applies "where the chief magistrate of a state is sued, not by his name, but by his style of office, and the claim made upon him is entirely in his official character." *Id.*, at 123–124. Although Madrazo argued that the Eleventh Amendment does not apply to suits in admiralty, the Court carefully avoided the question. Instead, it held that the District Court where the action was filed had no jurisdiction regardless of whether the Eleventh Amendment applied.[24]

Madrazo then filed an original admiralty proceeding directly against Georgia in this Court. Once again the Court avoided the question whether the Eleventh Amendment ap-

---

fore cannot possibly have "supported" the holding of *Bright* in the sense of approval or endorsement. Bright was an officer of the Pennsylvania state militia who defended the Rittenhouse home against federal soldiers attempting to enforce the judgment in *Peters*. Circuit Justice Washington's remarks, that the dissent characterizes as the "holding" of the case, *post*, at 498, actually were part of his charge to the jury. The Court had no opportunity to consider Justice Washington's statements, because it lacked jurisdiction to hear an appeal from Bright's conviction.

[24] The Court noted that the action was between a State and a foreign subject, an action within the Court's original jurisdiction under Article III, § 2, of the Constitution and § 13 of the Judiciary Act of 1789, 1 Stat. 73, 80. Thus, the Court concluded that, "if the 11th amendment . . . does not extend to proceedings in admiralty, it was a case for the original jurisdiction of the Supreme Court," *Governor of Georgia* v. *Madrazo*, 1 Pet., at 124, because it was a suit between a State and a foreign subject. This conclusion is surprising in view of the fact that the Judiciary Act of 1789, ch. 20, § 13, 1 Stat. 73, 80, conferred original, but not exclusive, jurisdiction of such actions on the Court. Congress had conferred admiralty jurisdiction on the district courts in § 9 of the Judiciary Act, 1 Stat. 76–77. Moreover, Chief Justice Marshall's opinion for the Court in *Cohens* v. *Virginia*, 6 Wheat., at 394–402, already had indicated that the Court's original jurisdiction under Article III is not exclusive. See D. Currie, The Constitution and the Supreme Court, 1789–1888, p. 105, n. 98 (1985).

plies to suits in admiralty. Instead, the Court concluded that the case was not an admiralty action, but was "a mere personal suit against a state, to recover proceeds in its possession." *Ex parte Madrazzo*, 7 Pet. 627, 632 (1833). This rather strained conclusion was contrary to "the assumption of all concerned" that the action was maritime in nature. D. Currie, The Constitution and the Supreme Court, 1789–1888, p. 105, n. 98 (1985).

On balance, the early cases in fact indicate that unconsenting States were immune from suits in admiralty.[25] At the very least, they demonstrate that the dissent errs in suggesting that the amenability of States to suits in admiralty was "settled," *post*, at 499.[26] We therefore decline to overrule precedents that squarely reject the dissenters' position.

## C

In deciding yet another Eleventh Amendment case, we do not write on a clean slate. The general principle of state sovereign immunity has been adhered to without exception by

---

[25] It is of course true, as the dissent observes, that Justice Story's treatise on the Constitution observed that a suit in admiralty is not, strictly speaking, a suit in law or equity. *Post*, at 499 (quoting 3 J. Story, Commentaries on the Constitution of the United States 560–561 (1833)). Justice Story, however, merely observed that "[i]t has been doubted whether [the eleventh] amendment extends to cases of admiralty and maritime jurisdiction," *id.*, at 560, and cited only the cases discussed above. Moreover, Justice Story was noted for his expansive view of the admiralty jurisdiction of federal courts. See, *e. g.*, *De Lovio* v. *Boit*, 7 Fed. Cas. 418 (No. 3,776) (CC Mass. 1815); Note, 37 Am. L. Rev. 911, 916 (1903) ("It was said of the late Justice Story, that if a bucket of water were brought into his court with a corn cob floating in it, he would at once extend the admiralty jurisdiction of the United States over it").

[26] In addition, the dissent accords little weight to early cases applying the general admiralty principle that maritime property belonging to a sovereign cannot be seized. *E. g.*, *The Schooner Exchange* v. *McFaddon*, 7 Cranch 116 (1812); *L'Invincible*, 1 Wheat. 238 (1816); *The Santissima Trinidad*, 7 Wheat. 283 (1822). See *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S., at 709–710, and n. 6 (opinion of WHITE, J.).

this Court for almost a century. The dissent nevertheless urges the Court to ignore *stare decisis* and overrule the long and unbroken series of precedents reaffirming this principle. If the Court were to overrule these precedents, a number of other major decisions also would have to reconsidered.[27] As we have stated, *supra*, at 478–479, the doctrine of *stare decisis* is of fundamental importance to the rule of law. For this

---

[27] The dissent is written as if the slate had been clean since *Hans* was decided 97 years ago. As noted above, *Hans* has been reaffirmed in case after case, often unanimously and by exceptionally strong Courts. The two principal holdings of *Hans* that the dissent challenges are that the federal judicial power does not extend either to suits against States that arise under federal law, or to suits brought against a State by its own citizens. If these holdings were rejected, the Court would overrule at least 17 cases, in addition to *Hans* itself. Twelve of these cases relied on *both* of these principles. See *Papasan* v. *Allain*, 478 U. S. 265 (1986); *Green* v. *Mansour*, 474 U. S. 64 (1985); *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234 (1985); *Edelman* v. *Jordan*, 415 U. S. 651 (1974); *Quern* v. *Jordan*, 440 U. S. 332, 342 (1979); *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S. 279 (1973); *Ford Motor Co.* v. *Department of Treasury of Indiana*, 323 U. S. 459 (1945); *Missouri* v. *Fiske*, 290 U. S. 18 (1933); *Ex parte New York, No. 1*, 256 U. S. 490 (1921); *Ex parte New York, No. 2*, 256 U. S. 503 (1921); *Duhne* v. *New Jersey*, 251 U. S. 311 (1920); *Fitts* v. *McGhee*, 172 U. S. 516 (1899). Four of them rested on the principles *Hans* established for determining when Congress has extended the federal judicial power to include actions against States under federal law. *County of Oneida* v. *Oneida Indian Nation of New York*, 470 U. S. 226 (1985); *Great Northern Life Insurance Co.* v. *Read*, 322 U. S. 47 (1944); *Murray* v. *Wilson Distilling Co.*, 213 U. S. 151 (1909); *Smith* v. *Reeves*, 178 U. S. 436 (1900). Finally, one would be overruled only to the extent the Court rejected the principle that the federal judicial power does not extend to suits against States by their own citizens. *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89 (1984).

Repudiation of these principles also might justify reconsideration of a variety of other cases that were concerned with this Court's traditional treatment of sovereign immunity. *E. g., Florida Dept. of Health and Rehabilitative Services* v. *Florida Nursing Home Assn.*, 450 U. S. 147 (1981); *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978); *Monaco* v. *Mississippi*, 292 U. S. 313 (1934); *Hopkins* v. *Clemson Agricultural College*, 221 U. S. 636 (1911).

reason, "any departure from the doctrine . . . demands special justification." *Arizona* v. *Rumsey*, 467 U. S., at 212. The arguments made in the dissent fall far short of justifying such a drastic repudiation of this Court's prior decisions.[28]

## VI

For the reasons we have stated, the judgment of the Court of Appeals for the Fifth Circuit is affirmed.

*It is so ordered.*

JUSTICE WHITE, concurring.

The Court expressly stops short of addressing the issue whether the Jones Act affords a remedy to seamen employed by the States. See *ante*, at 476, n. 6. The Court, however, has already construed the Jones Act to extend remedies to such seamen. *Petty* v. *Tennessee-Missouri Bridge Comm'n*, 359 U. S. 275, 282–283 (1959). Congress has not disturbed this construction, and the Court, as I understand it, does not now purport to do so.

JUSTICE SCALIA, concurring in part and concurring in the judgment.

Petitioner in this case did not assert as a basis for reversing the judgment that *Hans* v. *Louisiana*, 134 U. S. 1 (1890),

---

[28] Apart from rhetoric, the dissent relies on two arguments: (i) the "historical record," and (ii) the perceived "pernicious[ness]" of the principle of sovereign immunity. As we have noted, the fragments of historical evidence at the time of the adoption of the Constitution are as supportive of *Hans* v. *Louisiana* as they are of the dissent. In attaching weight to this ambiguous history, it is not immaterial that we are a century further removed from the events at issue than were the Justices who unanimously agreed in *Hans*. Not one of the 17 cases the dissent would overrule concludes that the historical evidence calls into question the principle of state sovereign immunity or justifies the ignoring of *stare decisis*. As for the view that it would be "pernicious" to protect States from liability for their "unlawful conduct," we have noted above that an aggrieved citizen such as petitioner in fact has a bundle of possible remedies. See *supra*, at 488, and n. 19.

had been wrongly decided. That argument was introduced by an *amicus*, addressed only briefly in respondents' brief, and touched upon only lightly at oral argument. I find both the correctness of *Hans* as an original matter, and the feasibility, if it was wrong, of correcting it without distorting what we have done in tacit reliance upon it, complex enough questions that I am unwilling to address them in a case whose presentation focused on other matters.

I find it unnecessary to do so in any event. Regardless of what one may think of *Hans*, it has been assumed to be the law for nearly a century. During that time, Congress has enacted many statutes—including the Jones Act and the provisions of the Federal Employers' Liability Act (FELA) which it incorporates—on the assumption that States were immune from suits by individuals. Even if we were now to find that assumption to have been wrong, we could not, in reason, interpret the statutes as though the assumption never existed. Thus, although the terms of the Jones Act (through its incorporation of the FELA) apply to all common carriers by water, I do not read them to apply to States. For the same reason, I do not read the FELA to apply to States, and therefore agree with the Court that *Parden* v. *Terminal Railway of Alabama Docks Dept.*, 377 U. S. 184 (1964), should be overruled. Whether or not, as *Hans* appears to have held, Article III of the Constitution contains an implicit limitation on suits brought by individuals against States by virtue of a nearly universal "understanding" that the federal judicial power could not extend to such suits, such an understanding clearly underlay the Jones Act and the FELA.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

The Court overrules *Parden* v. *Terminal Railway of Alabama Docks Dept.*, 377 U. S. 184 (1964), and thereby continues aggressively to expand its doctrine of Eleventh Amend-

ment sovereign immunity. I adhere to my belief that the doctrine "rests on flawed premises, misguided history, and an untenable vision of the needs of the federal system it purports to protect." *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 248 (1985) (BRENNAN, J., dissenting). In my view, the Eleventh Amendment does not bar the District Court's jurisdiction over the Jones Act suit by Jean Welch against the State of Texas and the Texas Highway Department for four independent reasons. First, the Amendment does not limit federal jurisdiction over suits in admiralty. Second, the Amendment bars only actions against a State by citizens of another State or of a foreign nation. Third, the Amendment applies only to diversity suits. Fourth, even assuming the Eleventh Amendment were applicable to the present case, Congress abrogated state immunity from suit under the Jones Act, which incorporates the Federal Employers' Liability Act (FELA). I therefore dissent.

I

Article III provides that the "judicial power" assigned to federal courts extends not only to "Cases in Law and Equity," but also "to all Cases of admiralty and maritime Jurisdiction." [1] In the instant case, the District Court stated that the "plaintiff brought this suit in admiralty." 533 F. Supp. 403, 404 (SD Tex. 1982). The Eleventh Amendment limits the

---

[1] Article III, § 2, provides:

"The judicial power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States; between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."

"Judicial power" in certain suits "in law or equity."[2]   There-
fore, even if the Eleventh Amendment does bar federal juris-
diction over cases in which a State is sued by its own citizen,
its express language reveals that it does so *only* in "Cases in
Law and Equity," and not in "Cases of admiralty and mari-
time Jurisdiction."

The leading case on the relationship between admiralty ju-
risdiction and the Eleventh Amendment for over a century
was *United States* v. *Bright*, 24 Fed. Cas. 1232 (No. 14,647)
(CC Pa. 1809), which was written by Circuit Justice Bushrod
Washington.   It held that the Eleventh Amendment does
not bar a suit in admiralty against a State.   Justice Wash-
ington acknowledged that a suit against a State raised sensi-
tive issues, but believed himself bound by the fact that the
Amendment does not refer to suits in admiralty.   Further-
more, he noted that a court usually possesses the subject
matter of the suit (*i. e.*, the ship) in an admiralty *in rem*
proceeding, and thereby avoids the "delicate" issue of con-
fronting a State with a decree commanding it to relinquish
certain property.   *Id.*, at 1236.   This was not a controversial
holding in its day.   While the Court during Chief Justice
Marshall's tenure did not have an opportunity to reach this
issue, its dictum in *United States* v. *Peters*, 5 Cranch 115
(1809), and *Governor of Georgia* v. *Madrazo*, 1 Pet. 110
(1828),[3] supported the holding of *Bright*.   See *Atascadero*

---

[2] The Eleventh Amendment provides:
"The Judicial power of the United States shall not be construed to extend
to any suit in law or equity, commenced or prosecuted against one of the
United States by Citizens of another State, or by Citizens or Subjects of
any Foreign State."
[3] None of these Marshall Court cases casts any doubt on the correctness
of *United States* v. *Bright*, 24 Fed. Cas. 1232 (No. 14,647) (CC Pa. 1809).
The Court, however, asserts that language in *United States* v. *Peters*,
5 Cranch, at 139–141, supports its viewpoint.   The language it cites, *ante*,
at 491, is taken out of context.   In *Peters*, the Court found that the
suit was not instituted against the State, but against a state official, as an
individual party.   5 Cranch, at 139.   Thus, the suit was not barred be-

*State Hospital* v. *Scanlon, supra,* at 292–293 (BRENNAN, J., dissenting).

"Although the Supreme Court did not pass on the applicability of the Eleventh Amendment in admiralty until more than a century later, it was assumed by bench and bar in the meantime that *Bright* was correctly reasoned." J. Orth, The Judicial Power of the United States 37 (1987). Justice Joseph Story wrote in 1833 that:

> "[T]he language of the amendment is, that 'the judicial power of the United States shall not be construed to extend to any suit *in law or equity.*' But a suit in the admiralty is not, correctly speaking, a suit in law or in equity; but is often spoken of in contradistinction to both." 3 J. Story, Commentaries on the Constitution of the United States 560–561 (1833) (emphasis in original), citing *United States* v. *Peters, supra; United States* v. *Bright, supra; Governor of Georgia* v. *Madrazo, supra.*

Nineteenth-century commentators regarded *Bright* as having settled the matter. Peter du Ponceau, in his lectures to the Law Academy of Philadelphia in 1834 simply stated: "It has been held that this restriction [by the Eleventh Amendment] does not extend to cases of admiralty and maritime jurisdiction." P. du Ponceau, A Brief View of the Constitution of the United States 37–38 (1834). See Fletcher, A Historical

cause "[t]he amendment simply provides, that no suit shall be commenced or prosecuted against a state." *Ibid.* The Court was focusing only on the identity of the defendant and not on the identity of the plaintiff. Indeed, the suit was brought by the United States Government, and States are not immune from actions brought by the United States. *Ante,* at 487. Read in context, the quotation from *Peters* cited by the Court provides no support for the Court's position.

The Court in *Peters* heavily relied on the Amendment's plain language to justify its view that the Amendment applied only to States and not to state officials. 5 Cranch, at 139. The *Bright* case resulted from an attempt to enforce the judgment rendered in *Peters.* As indicated, *supra,* at 498, the court in *Bright* also heavily relied on the plain language of the Amendment in holding that the Amendment did not affect admiralty suits.

Interpretation of the Eleventh Amendment: A Narrow Construction of an Affirmative Grant of Jurisdiction Rather than a Prohibition Against Jurisdiction, 35 Stan. L. Rev. 1033, 1080–1081 (1983).[4]

In 1921, *Bright* was disapproved of, at least in part, by *Ex parte New York, No. 1*, 256 U. S. 490 (1921). *Ex parte New York, No. 1*, involved libel actions against a state official in his official capacity in connection with vessels operated by the State of New York. The Court held that a State was immune under the Eleventh Amendment from an *in personam* suit in admiralty brought by a private individual without the State's consent.

The Court did not attempt to justify its obliteration of *Bright*'s distinction between cases in admiralty and cases in law or equity, but simply referred in passing to *Hans* v. *Louisiana*, 134 U. S. 1 (1890). 256 U. S., at 497–498.[5] Merely

---

[4] The universal acceptance of *Bright*'s holding suggests that States were not accorded status equal to foreign sovereigns in the early 19th century. See, *e. g.*, *The Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 136 (1812) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself"). The early admiralty cases cited today by the Court, *ante*, at 493, n. 25, indicate that foreign countries were accorded sovereign immunity based on the international consequences of a federal court's intervention. See, *e. g.*, *The Santissima Trinidad*, 7 Wheat. 283, 337 (1822) (Story, J.) ("The government of the United States has recognized the existence of a civil war between Spain and her colonies, and has avowed a determination to remain neutral between the parties, and to allow to each the same rights of asylum and hospitality and intercourse").

[5] The Court also cites two other cases that do not support its holding on the Eleventh Amendment issue. In *Ex parte New York, No. 2*, 256 U. S. 503 (1921), the Court held that an *in rem* action against a State was barred by the common-law principle that "property and revenue necessary for the exercise of powers [by government] are to be considered as part of the machinery of government exempt from seizure and sale under process against the city . . . ." *Id.*, at 511.

In *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S. 670 (1982) (opinion of STEVENS, J.), a four-Justice plurality held that the Eleventh Amendment did not bar the process issued by the District Court to secure

citing to *Hans* is plainly an inadequate justification. *Hans* was a suit based on federal-question jurisdiction and, moreover, relied primarily on materials that justified the application of the Eleventh Amendment to cases in diversity jurisdiction. See *infra*, at 509–516. It did not address the effect of the Eleventh Amendment on the extension of judicial power in Article III to admiralty suits.

The distinction between admiralty cases and ordinary cases in law or equity was not a casual or technical one from the viewpoint of the Framers of the Constitution. Admiralty was a highly significant, perhaps the most important, subject-matter area for federal jurisdiction at the end of the 18th century. "Maritime commerce was then the jugular vein of the Thirteen States. The need for a body of law applicable throughout the nation was recognized by every shade of opinion in the Constitutional Convention." F. Frankfurter & J. Landis, The Business of the Supreme Court 7 (1927). Alexander Hamilton noted in the Federalist No. 80: "The most bigoted idolizers of state authority have not thus far shewn a disposition to deny the national judiciary the cognizance of maritime causes." The Federalist No. 80, p. 538 (J. Cooke ed. 1961). Outside of *Ex parte New York, No. 1,* the Court has not ignored this legal distinction between admiralty and other cases in any other instance of constitutional and statutory interpretation. See, *e. g., Romero* v. *Interna-*

---

possession of artifacts held by state officials. The plurality distinguished the *Ex parte New York* cases because the "action [was] not an *in personam* action brought to recover damages from the State." 458 U. S., at 699. The Court carefully emphasized the narrowness of its holding: "In ruling that the Eleventh Amendment does not bar execution of the warrant, we need not decide the extent to which a federal district court exercising admiralty *in rem* jurisdiction over property before the court may adjudicate the rights of claimants to that property against sovereigns that did not appear and voluntarily assert any claim that they had to the res." *Id.*, at 697. Four Justices dissented in part from the judgment on the ground that the action was a suit against the State and therefore barred by the Eleventh Amendment. *Id.*, at 705, 706 (opinion of WHITE, J., joined by POWELL, REHNQUIST, and O'CONNOR, JJ.).

*tional Terminal Operating Co.*, 358 U. S. 354, 368 (1959); *Atkins* v. *The Disintegrating Co.*, 18 Wall. 272, 302–303 (1874); *Waring* v. *Clarke*, 5 How. 441, 459–460 (1847); *American Insurance Co.* v. *Canter*, 1 Pet. 511, 545–546 (1828). Cf. *Parsons* v. *Bedford*, 3 Pet. 433, 446–447 (1830) (neither admiralty nor equity cases were suits in law within the Seventh Amendment jury provision).

Even if the Court is not prepared to overrule *Ex parte New York, No. 1*, that case can and should be distinguished here. It involved a suit based on the *common law* of admiralty and state law. In contrast, the present admiralty suit seeks to enforce a *federal statute*, the Jones Act. Although the Jones Act is deemed not to satisfy the Court's requirement that Congress use "unmistakable language" to abrogate a State's sovereign immunity, it does explicitly provide for federal jurisdiction for suits under the statute. Congress specifically indicated in the Jones Act that "any seaman"[6] may maintain an action for personal injury under the Act and that "[j]urisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located." 46 U. S. C. § 688. Whatever the merits of the "unmistakable language" requirement in cases of law and equity, it is completely out of place in admiralty cases resting on federal statute, in light of the fact that admiralty is not mentioned in the Eleventh Amendment.[7] Ac-

---

[6] Welch's "status as a 'seaman' under the Jones Act is assumed and is not at issue." 780 F. 2d 1268, 1269 (CA5 1986).

[7] In my view, there is no reason to depart from normal rules of statutory construction to determine Congress' intent regarding admiralty suits against States in federal court. The Court has applied normal rules of statutory construction when Congress exercises its authority under an Amendment that expressly contemplates limitations on States' authority, see *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 452–453 (1976), despite the Eleventh Amendment's *express* jurisdictional bar against certain suits in law or equity. *A fortiori*, we should apply normal statutory construction when Congress exercises its express authority to extend federal jurisdiction over

cordingly, in admiralty cases involving federal legislation, any bar implied by *Ex parte New York, No. 1,* against common-law suits in admiralty is inapplicable.[8]

Thus, a narrow holding allowing federal jurisdiction over Welch's suit in admiralty under the Jones Act against the State of Texas is consistent with precedent and the will of Congress,[9] and prevents further erosion of a legal distinc-

admiralty cases and the Eleventh Amendment *does not expressly* bar the exercise of that authority.

It seems odd for the Court to impose an "unmistakable language" requirement on the Jones Act, especially based on an interpretation of the Eleventh Amendment that incorporates words that are not there. Departing from normal rules of statutory construction inevitably will frustrate the will of Congress. When the Jones Act was enacted, *Bright* was the prevailing precedent. Moreover, in my view, Congress expressed its intent in unmistakable language when it extended liability to employers of "any seaman" and explicitly provided for federal jurisdiction over such actions.

[8] In addition, as Part IV discusses, *infra,* at 517–519, we should be especially hesitant to incorporate the concept of state sovereign immunity with respect to those subjects over which the Constitution expressly grants authority to the National Government. Foreign and interstate commerce, which necessarily encompasses matters of admiralty, is obviously such a subject area. As we said in *United States* v. *California,* 297 U. S. 175 (1936), in rejecting an argument that a State was not subject in its sovereign capacity to a federal statute regulating interstate commerce:

"We can perceive no reason for extending [the canon of construction that a sovereign is presumptively not intended to be bound by a statute unless named in it] as to exempt a business carried on by a state from the otherwise applicable provisions of an act of Congress, all-embracing in scope and national in its purpose, which is capable of being obstructed by state as by individual action. Language and objectives so plain are not to be thwarted by resort to a rule of construction whose purpose is but to resolve doubts, and whose application in the circumstances would be highly artificial." *Id.,* at 186–187.

[9] In *Petty* v. *Tennessee-Missouri Bridge Comm'n,* 359 U. S. 275, 282 (1959), the Court considered the substantive applicability of the Jones Act to state employees: " 'When Congress wished to exclude state employees, it expressly so provided.' . . . The Jones Act . . . has no exceptions from the broad sweep of the words 'Any seaman who shall suffer personal

tion which is difficult, if not impossible, to rationalize. It is patently improper to extend the Eleventh Amendment doctrine of sovereign immunity any further.[10]

## II

The Eleventh Amendment does not bar a suit under the Jones Act by a Texas citizen against the State of Texas. The part of Article III, § 2, that was affected by the Amendment provides: "The judicial Power shall extend . . . to Controversies . . . between a State and Citizens of *another* State" and "between a State . . . and foreign . . . Citizens or Subjects" (emphasis added). The Amendment uses language identical to that in Article III to bar the extension of the judicial power to a suit "against one of the United States by Citizens of *another* State, or by Citizens or Subjects of any Foreign State" (emphasis added). The congruence of the language suggests that the Amendment specifically limits only the jurisdiction conferred by the above-referenced part of Article III. Thus, the Amendment bars only federal actions brought against a State by citizens of another State or by aliens.

Contrary to the Court's view, *ante,* at 480–484, a proper assessment of the historical record of the Constitutional Convention and the debates surrounding the state ratification conventions confirms this interpretation. See *Atascadero State Hospital* v. *Scanlon,* 473 U. S., at 263–280 (BRENNAN, J., dissenting). The Court exclusively relies on the remarks of Madison, Hamilton, and Marshall at the Virginia Convention to support its contrary position. *Ante,* at 480–484. But these statements must be considered in context.

---

injury in the course of his employment may' etc." (citations omitted). The Court today does not disturb this holding. See *ante,* at 495 (WHITE, J., concurring).

[10] Cf. *United States* v. *Johnson,* 481 U. S. 681, 692 (1987) (SCALIA, J., dissenting) (arguing against extension of the *Feres* doctrine (*Feres* v. *United States,* 340 U. S. 135 (1950)) in order to "limit our clearly wrong decision in *Feres* and confine the unfairness and irrationality that decision has bred").

At the Virginia Convention, discussion focused on the question of Virginia's liability for debts that arose under state law, and which could be brought into federal court only through diversity suits by citizens of *another* State. See 3 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 533 (2d ed. 1861) (hereinafter Elliot's Debates) (Madison) ("[Federal] jurisdiction in controversies between a state and citizens of *another* state is much objected to, and perhaps without reason . . .") (emphasis added); The Federalist No. 81, p. 548 (J. Cooke ed. 1961) (Hamilton) ("It has been suggested that an assignment of the public securities of one State to the citizens of *another*, would enable them to prosecute that state in the federal courts for the amount of those securities . . .") (emphasis added); 3 Elliot's Debates 555 (Marshall) ("With respect to disputes between a state and the citizens of *another* state, its jurisdiction has been decried with unusual vehemence . . .") (emphasis added).

Thus, the delegates to the Virginia Convention were not objecting to suits initiated by citizens of the same State; what concerned them were suits by citizens of *other* States. The majority of the delegates who spoke at the Virginia Convention, including Mason, Henry, Pendleton, and Randolph, did *not* believe that state sovereign immunity provided protection against suits initiated by citizens of other States. See *Atascadero, supra,* at 264–280. Moreover, those attending the Virginia Convention evidently were not persuaded by the rhetoric of Madison, Hamilton, and Marshall cited by the Court. The Convention endorsed an amendment that would have explicitly denied the federal judiciary authority over controversies between a State and citizens of other States. 3 Elliot's Debates 660–661. The felt need for this amendment shows that the delegates did not believe that state sovereign immunity barred all suits against States.[11]

_____

[11] Similar proposals submitted in New York, North Carolina, and Rhode Island urged amendments depriving federal courts of jurisdiction over

There is little evidence that Madison[12] or Hamilton[13] believed that Article III failed to authorize diversity or federal-question suits brought by citizens against States. We know

cases instituted against a State by a citizen of another State or by an alien. See C. Jacobs, The Eleventh Amendment and Sovereign Immunity 64 (1972).

[12] Madison's view of this issue is not clear. As legal historian Clyde Jacobs concluded, "[w]hether Madison thought that federal courts should possess any jurisdiction over suits instituted against a state by citizens of another state or by foreigners must remain a matter of some conjecture; indeed there is no direct evidence that he considered the question at all. . . ." *Id.*, at 12. Professor Jacobs also noted:

"Madison and other nationalists believed that the federal judiciary should be armed with powers not only to maintain the supremacy of national law but also to review state judicial decisions that might have interstate or foreign ramifications. Thus one of the principal reasons nationalists advanced for extending the federal judicial power—the maintenance of international peace and domestic harmony—would appear to necessitate national jurisdiction in cases where the good faith of the states vis-à-vis foreigners and citizens of other states had been engaged. If, however, this proposed federal judicial jurisdiction were qualified by the doctrine of state immunity, a broad avenue would have been left open to defeat every claim made upon them by citizens of other states and by aliens. The exception to the jurisdiction would have made the proposed jurisdiction futile or, at least, negligible." *Id.*, at 13–14.

[13] Hamilton's writings in The Federalist, No. 80, suggest that he did not believe that Article III barred all suits against States:

"It may be esteemed the basis of the union, that 'the citizens of each state shall be entitled to all the privileges and immunities of citizens of the several states.' And if it be a just principle that every government *ought to possess the means of executing its own provisions by its own authority*, it will follow, that in order to the inviolable maintenance of that equality of privileges and immunities to which the citizens of the union will be entitled, *the national judiciary ought to preside in all cases in which one state or its citizens are opposed to another state or its citizens.* To secure the full effect of so fundamental a provision against all evasion and subterfuge, it is necessary that its construction should be committed to that tribunal, which, having no local attachments, will be likely to be impartial between the different states and their citizens, and which, owing its official existence to the union, will never be likely to feel any bias inauspi-

Marshall's understanding of Article III from his opinions written for the Court. The Chief Justice, in *Cohens* v. *Virginia*, 6 Wheat. 264 (1821), interpreted the effect of Article III on the Court's jurisdiction to review an appeal involving, as parties, a State and a citizen of the same State. The State of Virginia was sued for a writ of error in the United States Supreme Court. The writ challenged a criminal conviction obtained in a Virginia state court. The Court rejected the State's contention that the Constitution denied federal jurisdiction over the appeal. It concluded that Article III provides federal jurisdiction "to all [federal-question cases] without making in its terms any exception whatever, and without any regard to the condition of party." *Id.*, at 378. The Chief Justice then considered whether, in the face of Article III's clear language, a general principle of state sovereign immunity could be implied. He concluded:

> "From this general grant of jurisdiction [in federal-question cases], no exception is made of those cases in which a State may be a party. When we consider the situation of the government of the Union and of a State, in relation to each other; the nature of our constitution; the subordination of the state governments to that constitution; the great purpose for which jurisdiction over all cases arising under the constitution and laws of the United States, is confided to the judicial department; *are we at liberty to insert in this general grant, an exception of those cases in which a State may be a party? Will the spirit of the constitution justify this attempt to control its words? We think it will not.* We think a case arising under the constitution or laws of the United States,

cious to the principles on which it is founded." The Federalist No. 80, pp. 537–538 (J. Cooke ed. 1961) (first emphasis in original; second emphasis added).

is cognizable in the Courts of the Union, whoever may be the parties to that case" (emphasis added).  *Id.*, at 382–383.[14]

The Court in *Cohens* also clearly revealed its understanding that the Eleventh Amendment was inapplicable to a suit brought by a citizen against his or her own State.  After concluding that the petition for a writ of error was not properly understood as a suit commenced or prosecuted against a State, the Chief Justice stated an alternative holding:

> "But should we in this be mistaken, the error does not affect the case now before the Court.  If this writ of error be a suit in the sense of the 11th amendment, it is not a suit commenced or prosecuted 'by a citizen of another State, or by a citizen or subject of any foreign State.'  *It is not then within the amendment*, but is governed entirely by the constitution as originally framed, and we have already seen, that in its origin, the judicial

---

[14] In *Cohens*, Chief Justice Marshall explained in detail the effect of the general principle of sovereign immunity on the scope of Article III:

"The Counsel for the [State] . . . have laid down the general proposition, that a sovereign independent state is not suable except by its own consent.

"This general proposition will not be controverted.  But its consent is not requisite in each particular case.  It may be given in a general law.  And if a state has surrendered any portion of its sovereignty, the question whether a liability to suit be a part of this portion, depends on the instrument by which the surrender is made.  If, upon a just construction of that instrument, it shall appear that the state has submitted to be sued, then it has parted with this sovereign right of judging in every case on the justice of its own pretensions, and has entrusted that power to a tribunal in whose impartiality it confides."  *Cohens* v. *Virginia*, 6 Wheat., at 380.

The Court then found that in agreeing to the Constitution, the States had surrendered a significant measure of their sovereignty.  It stated that the Supremacy Clause is evidence of this surrender.  *Id.*, at 380–381. The Court therefore found that Article III extended jurisdiction to all federal-question suits and that "no exception is made of those cases in which a state may be party."  *Id.*, at 382–383.

power was extended to all cases arising under the constitution or laws of the United States, without respect to parties." *Id.*, at 412 (emphasis added).

Chief Justice Marshall reaffirmed this view of the Eleventh Amendment when he wrote for the Court in *Osborn* v. *Bank of the United States*, 9 Wheat. 738, 857–858 (1824):

"The amendment has its full effect, if the constitution be construed as it would have been construed, had the jurisdiction of the court never been extended to suits brought against a State, by the citizens of another State, or by aliens."

The Court, however, chooses to ignore the clear meaning of the Constitution text based on speculation that the intentions of a few of the Framers and Ratifiers might have been otherwise. The evidence available reveals that the views of Madison and Hamilton on the issue are at best ambiguous, see nn. 12 and 13, *supra*, and that Marshall's understanding runs directly counter to the Court's position. Thus, the Eleventh Amendment only bars a federal suit initiated by citizens of another State. Moreover, as Part III demonstrates, the Amendment only bars a particular type of federal suit — an action based on diversity jurisdiction.

## III

In my view, the Eleventh Amendment applies only to diversity suits and not to federal-question or admiralty suits. The parallel between the language in Article III's grant of diversity jurisdiction ("to Controversies . . . between a State and Citizens of another State . . . and between a State . . . and foreign States, Citizens or Subjects") and the language in the Eleventh Amendment ("any suit in law or equity . . . by Citizens of another State or by Citizens or Subjects of any Foreign State") supports this view. The Amendment prohibits federal jurisdiction over *all* such suits in law or

equity which are based on diversity jurisdiction. Since Congress had not granted federal-question jurisdiction to federal courts prior to the Amendment's ratification, the Amendment was not intended to restrict that type of jurisdiction. Furthermore, the controversy among the Ratifiers cited by the Court today, *ante,* at 480–484, involved only *diversity* suits. Moreover, the Court recognizes that the immediate impetus for adoption of the Eleventh Amendment was *Chisholm* v. *Georgia,* 2 Dall. 419 (1793). *Ante,* at 484. *Chisholm* was a *diversity* case brought in federal court upon a state cause of action against the State of Georgia by a citizen of South Carolina. The Court relies on *Hans* v. *Louisiana,* 134 U. S. 1 (1890), to hold that the Eleventh Amendment bars Welch's suit in admiralty.

*Hans,* however, was a *federal-question* suit brought by a Louisiana citizen against his own State. Ignoring this fact, the Court in *Hans* relied on materials that primarily addressed the question of state sovereign immunity in diversity cases, and not on federal-question or admiralty cases.[15] It is plain from the face of the *Hans* opinion that the Court misunderstood those materials.[16] In particular, the Court in

---

[15] See generally Brief of the American Federation of Labor and Congress of Industrial Organizations as *Amicus Curiae* 11–23.

[16] A legal historian, Professor John Orth, recently described the historical approach taken by the Court in *Hans:*

"In *Hans* v. *Louisiana,* . . . Justice Bradley rewrote the history of the Eleventh Amendment. . . . Only half a dozen years before, in [*New Hampshire* v. *Louisiana,* 108 U. S. 76 (1883),] written by Chief Justice Waite and joined by Justice Bradley, the Court had accepted *Chisholm* as a correct interpretation of the Constitution as it then stood. . . .

"How did Justice Bradley suddenly attain such unhedged certitude about the original understanding and the Eleventh Amendment? No surprising discoveries about the historical record had been made in the decade of the 1880s. The Justice himself merely rehashed the familiar quotations from Madison, Marshall, and Hamilton. With regard to *Chisholm* Bradley declaimed: 'In view of the manner in which that decision was received by the country, the adoption of the Eleventh Amendment, the light of history and the reason of the thing, we think we are at liberty to prefer Justice

*Hans* heavily relied on two sources: a statement by Hamilton in The Federalist No. 81 and the views of Justice Iredell, who wrote the dissent in *Chisholm*. 134 U. S., at 12, 13–14, 18–19. A close examination of both these sources indicates that they cannot serve as support for the holding of *Hans* or of the Court today.

### A

The Court today relies on the same quotation of Hamilton in The Federalist No. 81 cited by the Court in *Hans*. Compare 134 U. S., at 12–13, with *ante*, at 480–481, n. 10. The Court in *Hans* used this quotation as proof that all suits brought by individuals against States were barred, absent their consent. 134 U. S., at 14–15. But, in that passage, Hamilton was discussing cases of diversity jurisdiction, not of federal-question jurisdiction:

> "It has been suggested that an assignment of the *public securities of one state to the citizens of another*, would enable them to prosecute that state in the federal courts for the amount of those securities. A suggestion which the following considerations prove to be without foundation." The Federalist No. 81, p. 548 (J. Cooke ed. 1961) (emphasis added).

In the ensuing discussion, Hamilton described the circumstances in which States can claim sovereign immunity. He began with the general principle of sovereign immunity.

> "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent.*

---

Iredell's views . . . .' Yet Iredell's dissent was manhandled. . . . Attributing sovereign immunity to the states, Bradley began the confusion that still prevails between federal and state sovereignty.

"Nothing had arisen since the decision of the New Hampshire case to change Bradley's view of the past—except the pressing need for a new rationale to justify a new result. If sovereign immunity had not existed, the Justice would have had to invent it. As it was, all that was required was to rewrite a little history." J. Orth, The Judicial Power of the United States 74–75 (1987) (Orth).

> This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every state in the union." *Id.*, at 548–549.

Hamilton believed that the States surrendered at least part of their sovereign immunity when they agreed to the Constitution. The States, however, retained their sovereign authority over state-created causes of action. "Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the states and the danger intimated must be merely ideal." *Id.*, at 549. Thus, the States retained their sovereign authority over diversity suits involving the state assignment of public securities to citizens of other States.

> "A recurrence to the principles there established will satisfy us that there is no color to pretend that the State governments would, by the adoption of that plan, be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith. The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretensions to a compulsive force. They confer no right of action independent of the sovereign will. To what purpose would it be to authorize suits against States for the debts they owe? How could recoveries be enforced? It is evident, that it could not be done without waging war against the contracting state; and to ascribe to the federal courts, by mere implication, and in destruction of a pre-existing right of the state governments, a power which would involve such a consequence, would be altogether forced and unwarrantable." *Ibid.*

Hamilton therefore believed that States could not be sued in federal court by citizens to collect debts in diversity ac-

tions. A careful reading of this passage demonstrates that it does not support the general principle of sovereign immunity against all suits brought by individuals against States, contrary to the Court's views in *Hans* and in the present case.

B

The Court in *Hans* also heavily relied on the rationale stated by Justice Iredell in *Chisholm*. The Court in *Chisholm* held that the case was within the jurisdiction of the Federal District Court. The Eleventh Amendment was thereafter enacted with "vehement speed," displacing the *Chisholm* ruling. *Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U. S. 682, 708 (1949). The dissent of Justice Iredell is generally regarded as embodying the rationale of the Eleventh Amendment by those who broadly construe it. See *Hans* v. *Louisiana, supra,* at 12, 14, 18–19; see also Fletcher, 35 Stan. L. Rev., at 1077; Field, The Eleventh Amendment and Other Sovereign Immunity Doctrines: Part One, 126 Pa. L. Rev. 515, 541 (1978). Nevertheless, I think it plain that Justice Iredell's conception of state sovereign immunity *supports* the notion that States should not be immune from suit in federal court in federal-question or admiralty cases.

Justice Iredell's dissent focused on whether the States delegated part of their sovereignty to the Federal Government upon entering into the Union and agreeing to the Constitution.

> "Every State in the Union in every instance where its sovereignty has not been delegated to the United States, I consider to be as completely sovereign, as the United States are in respect to the powers surrendered. The United States are sovereign as to all the powers of Government actually surrendered. Each State in the Union is sovereign as to all the powers reserved." 2 Dall., at 435.

Justice Iredell defined the powers surrendered by the States in terms of the authority that resides in the Congress and the Executive Branch.

> "The powers of the general Government, either of a Legislative or executive nature, or which particularly concern Treaties with Foreign Powers, do for the most part (if not wholly) affect individuals, and not States. They require no aid from any State authority. This is the great leading distinction between the old articles of confederation, and the present constitution." *Ibid.*

He then defined the "judicial power" of Article III. Justice Iredell found that the federal judicial power "is of a peculiar kind" because of its hybrid nature. *Ibid.* His conception of state sovereign immunity centered on the dual sources of federal judicial authority. First, he delineated the portion of federal jurisdiction that "is indeed commensurate with the ordinary Legislature and Executive powers of the general government, and the Power which concerns treaties." *Ibid.* This category encompasses matters wholly within the federal sovereignty. Justice Iredell plainly was describing the federal-question and admiralty jurisdiction where federal courts have jurisdiction based on the federal subject matter of the cases.[17]

---

[17] Justice Story later drew the same distinction between federal subject-matter jurisdiction and federal diversity jurisdiction as did Justice Iredell: "The vital importance of all the cases enumerated in the first class to the national sovereignty, might warrant such a distinction. In the first place, as to cases arriving under the constitution, laws, and treaties of the United States. Here the state courts could not ordinarily possess a direct jurisdiction. The jurisdiction over such cases could not exist in the state courts previous to the adoption of the constitution, and it could not afterwards be directly conferred on them; for the constitution expressly requires the judicial powers to be vested in courts ordained and established by the United States. . . . The same remarks may be urged as to cases affecting ambassadors, other public ministers, and consuls . . . and as to cases of admiralty and maritime jurisdiction . . . . All these cases, then, enter into the na-

Justice Iredell then stated: "But [the judicial power] also goes further." *Ibid.* It was in the further extension of judicial power that the sovereign immunity of the States was implicated. In diversity cases, the federal judiciary was not dealing with subject matter within the realm of federal sovereignty, but was instead providing a neutral forum for the resolution of state-law issues over which the States had not given up their sovereignty.

> "Where certain parties are concerned, although the subject in controversy does not relate to any of the special objects of authority of the general Government, wherein the separate sovereignties of the States are blended in one common mass of supremacy, yet the general Government has a Judicial Authority in regard to such subjects of controversy, and the Legislature of the United States may pass all laws necessary to give such Judicial Authority its proper effect. So far as States under the Constitution can be made legally liable to this authority, so far to be sure they are subordinate to the authority of the United States, and their individual sovereignty is in this respect limited. But it is limited no farther than the necessary execution of such authority requires." *Id.*, at 435–436.

Justice Iredell was concerned with "the limit of our authority" in the diversity case before the Court, since "we can exercise no authority in the present instance consistently with the clear intention of the [Judiciary Act], but such as a proper State Court would have been at least competent to exercise at the time the act was passed." *Id.*, at 436–437.

---

tional policy, affect the national rights, and may compromise the national sovereignty. . . .

"A different policy might well be adopted in reference to the second class of cases . . . ." *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 334–335 (1816). See generally Amar, A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction, 65 B. U. L. Rev. 205 (1985).

"If therefore, no new remedy be provided (as plainly is the case), and consequently we have no other rule to govern us but the principles of the pre-existent [state] laws, which must remain in force till superceded by others, then it is incumbent upon us to enquire, whether previous to the adoption of the Constitution . . . an action of the nature like this before the Court could have been maintained against one of the States in the Union upon the principles of the common law, which I have shown to be alone applicable. If it could, I think it is now maintainable here: If it could not, I think, as the law stands at present, it is not maintainable . . . ." *Id.*, at 437.

Thus, Justice Iredell's dissenting opinion rested on a conception of state sovereignty that justified the incorporation of the sovereign-immunity doctrine through the state common law, but *only* in *diversity* suits. His opinion traditionally has been cited as key to the underlying meaning of the Eleventh Amendment. See *Hans* v. *Louisiana*, 134 U. S., at 12. Yet it provides no more support for the result in *Hans* than does the plain language of the Eleventh Amendment.[18]

I will not repeat the exhaustive evidence presented in my dissent in *Atascadero* that further buttresses my view of the Eleventh Amendment sovereign immunity. See *Atascadero*, 473 U. S., at 247–304. I adhere to the view that a suit brought under a federal law against a State is not barred.

---

[18] Justice Iredell avoided committing himself on the broader constitutional question concerning whether suits, other than those in diversity, were barred by the Eleventh Amendment. He noted: "So much, however, has been said on the Constitution, that it may not be improper to intimate that my present opinion is strongly against any construction of it, which will admit, under any circumstances, a compulsive suit against a State for the recovery of money." *Chisholm* v. *Georgia*, 2 Dall. 419, 449 (1793). Nonetheless, he conceded, "[t]his opinion I hold, however, with all the reserve proper for one, which, according to my sentiments in this case, may be deemed in some measure extra-judicial." *Id.*, at 450.

## IV

The Court today overrules, in part, *Parden* v. *Terminal Railway of Alabama Docks Dept.*, 377 U. S. 184 (1964). It rejects the holding in *Parden* that Congress evidenced an intention to abrogate Eleventh Amendment immunity by making FELA applicable to "every common carrier by railroad while engaging in commerce between any of the several States. . . ." § 1, 35 Stat. 65, 45 U. S. C. § 51. The Court instead concludes that Congress did not abrogate the sovereign immunity of States, because it did not express this intent in unmistakably clear language.

The Court's departure from normal rules of statutory construction frustrates the will of Congress. The Court's holding in *Parden* that Congress intended to abrogate the sovereign immunity of States in FELA has not been disturbed by Congress for the past two decades. In FELA, Congress not only indicated that "every common carrier . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce," but also expressed in unequivocal language that the "action may be brought in a district court of the United States." 45 U. S. C. §§ 51, 56. The Court in *Parden* noted that the legislative history of FELA revealed that Congress meant to extend the scope to apply to "all commerce," without exception for state-owned carriers. 377 U. S., at 187, n. 5.

In *Parden*, the Court also comprehensively reviewed other federal statutes regulating railroads in interstate commerce, which used similar terminology. It found that we had consistently interpreted those statutes to apply to state-owned railroads. *Id.*, at 188–189, quoting *United States* v. *California*, 297 U. S. 175, 185 (1936) ("'No convincing reason is advanced why interstate commerce and persons and property concerned in it should not receive the protection of the act whenever a state, as well as a privately-owned carrier, brings itself within the sweep of the statute'"); *California* v. *Taylor*, 353 U. S. 553, 564 (1957) ("The fact that Congress

chose to phrase the coverage of the Act in all-embracing terms indicates that state railroads were included within it"). This conclusion confirmed the Court's determination in *Petty* v. *Tennessee-Missouri Bridge Comm'n*, 359 U. S. 275 (1959): "In [*Taylor*] we reviewed at length federal legislation governing employer-employee relationships and said, 'When Congress wished to exclude state employees, it expressly so provided.'" *Id.,* at 282 (citation omitted).

The Court today repeatedly relies on a bare assertion that "the constitutional role of the States sets them apart from other employers and defendants." *Ante,* at 477. This may be true in many contexts, but it is not applicable in the sphere of interstate commerce. Congress has plenary authority in regulating this area. In *Gibbons* v. *Ogden,* 9 Wheat. 1, 196–197 (1824), the Court stated:

> "If, as has always been understood, the sovereignty of congress, though limited to specified objects is plenary as to those objects, the power over commerce with foreign nations, and among the several States, is vested in congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States."

Thus, the Court in *Parden* concluded that the decision to regulate employers of interstate workers, be they private individuals or States, was for Congress to make:

> "While a State's immunity from suit by a citizen without its consent has been said to be rooted in 'the inherent nature of sovereignty,' . . . the States surrendered a portion of their sovereignty when they granted Congress the power to regulate commerce.
>
> "If Congress made the judgment that, in view of the dangers of railroad work and the difficulty of recovering for personal injuries under existing rules, railroad workers in interstate commerce should be provided with the

right of action created by the FELA, we should not presume to say, in the absence of express provision to the contrary, that it intended to exclude a particular group of such workers from the benefits conferred by the Act." 377 U. S., at 189–190.

Until today, *Parden* has been repeatedly cited by the Court as an established approach "to the test of waiver of the Eleventh Amendment." *County of Oneida* v. *Oneida Indian Nation of New York,* 470 U. S. 226, 252, n. 26 (1985) (POWELL, J.); see, *e. g., Fitzpatrick* v. *Bitzer,* 427 U. S. 445, 452 (1976). I believe that *Parden* was correctly decided. "[B]y engaging in the railroad business a State cannot withdraw the railroad from the power of the federal government to regulate commerce." *New York* v. *United States,* 326 U. S. 572, 582 (1946). In my view, Congress abrogated state immunity to suits under FELA, a statute incorporated by the Jones Act.

## V

Sound precedent should produce progeny whose subsequent application of principle in light of experience confirms the original wisdom. Tested by this standard, *Hans* has proved to be unsound. The doctrine has been unstable, because it lacks a textual anchor, an established historical foundation, or a clear rationale.[19] We should not forget that the

---

[19] Today only four Members of the Court advocate adherence to *Hans.* Three factors counsel against continued reliance upon *Hans.* First, *Hans* misinterpreted the intent of the Framers and those who ratified the Eleventh Amendment. Cf. *Michelin Tire Corp.* v. *Wages,* 423 U. S. 276, 297–298 (1976) (overruling *Low* v. *Austin,* 13 Wall. 29 (1872), because it ignored the language and objectives of the Import-Export Clause and misread earlier Court precedent). Second, the progeny of *Hans* has produced erratic and irrational results. If a general principle of state sovereign immunity is based on the sensitive problems inherent in making one sovereign appear against its will in the courts of other sovereigns, *ante,* at 486–487, then it is inexplicable why States can be sued in some cases (by other States, by the Federal Government, or when prospective relief is sought) and not in other instances (by foreign countries, by citizens of the same State, or when

irrationality of the doctrine has its costs. It has led to the development of a complex set of rules to avoid unfair results.[20] See, *e. g.*, *Ex parte Young*, 209 U. S. 123 (1908) (Amendment does not bar suit if plaintiff names state official, rather than State itself, as defendant); *Edelman* v. *Jordan*, 415 U. S. 651 (1974) (Amendment does not bar prospective, but only retrospective, relief). The doctrine, based on a notion of kingship, intrudes impermissibly on Congress' lawmaking power. I adhere to my belief that:

> "[T]he doctrine that has thus been created is pernicious. In an era when sovereign immunity has been generally recognized by courts and legislatures as an anachronistic and unnecessary remnant of a feudal legal system, . . . the Court has aggressively expanded its scope. If this doctrine were required to enhance the liberty of our people in accordance with the Constitution's protections, I could accept it. If the doctrine were required by the structure of the federal system created by the Framers, I could accept it. Yet the current doctrine intrudes on the ideal of liberty under law by protecting the States from the consequences of their illegal conduct. And the

retrospective relief is sought). The Court's recital of the rules of sovereign immunity in *Monaco* v. *Mississippi*, 292 U. S. 313 (1934), indicates the crazy-quilt pattern of the *Hans* doctrine. *Ante*, at 487. Third, the Eleventh Amendment doctrine creates inconsistencies in constitutional interpretation. For example, under the Seventh Amendment, the Court has stated that a right to a jury trial does not extend to admiralty cases because these suits in admiralty are distinguishable from suits in law. See *Parsons* v. *Bedford*, 3 Pet. 433, 446–447 (1830). Yet today the Court ignores the distinction between suits in admiralty and in law in arriving at its decision.

[20] As Professor Orth concludes:

"By the late twentieth century the law of the Eleventh Amendment exhibited a baffling complexity. . . . 'The case law of the eleventh amendment is replete with historical anomalies, internal inconsistencies, and senseless distinctions.' Marked by its history as were few other branches of constitutional law, interpretation of the Amendment has become an arcane specialty of lawyers and federal judges." Orth 11 (citation omitted).

decision obstructs the sound operation of our federal system by limiting the ability of Congress to take steps it deems necessary and proper to achieve national goals within its constitutional authority." *Atascadero State Hospital* v. *Scanlon*, 473 U. S., at 302 (dissenting opinion) (citations omitted).

By clinging to *Hans*, the Court today erases yet another traditional legal distinction and overrules yet another principle that defined the limits of that decision. In my view, we should at minimum confine *Hans* to its current domain. More fundamentally, however, it is time to begin a fresh examination of Eleventh Amendment jurisprudence without the weight of that mistaken precedent. I therefore dissent.